

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, J.   The defendant was found guilty and sentenced for the crimes of first degree murder—party to a crime and armed robbery—party to a crime, contrary to secs. 940.01(1), 943.32(1) (a) and (2), and 939.05, Stats. He was sentenced to a term of life imprisonment on the first-degree-murder charge and a concurrent five-year term on the armed-robbery charge.

The issues presented on this appeal are whether the defendant, who was represented by counsel, knowingly, intelligently, and voluntarily waived his *Miranda* rights to have counsel with him during custodial interrogation, and knowingly, intelligently, and voluntarily waived his *Miranda* right to remain silent. We conclude that Schilling's confession was admissible although it was obtained in the absence of his attorney, because he clearly understood that he had the right to the presence of counsel and expressly waived that right and the right to remain silent.

While his refusal to sign a statement or to permit his oral statement to be taped suggests that he might have been mistaken as to the law, such mistake does not make his waiver of the *Miranda* right to counsel or the waiver of the right to remain silent unintelligent.

The fact that an interrogating police officer suddenly confronted the defendant with evidence which he suggested might prove to be incriminating did not constitute trickery so as to make the waiver of *Miranda* rights ineffective.

We also conclude that the length of the interrogation did not result in an involuntary confession in light of the totality of the circumstances.

We affirm.

This appeal arose out of the same murder and robbery detailed in *Zelenka v. State,* 83 Wis.2d 601, 266 N.W.2d 279 (1978). Accordingly, the facts of the murder and of the robbery are not repeated extensively herein.

On this appeal the sufficiency of the evidence at trial is not disputed. The confession which was introduced was, however, an integral part of the evidence necessary to support the jury's finding of guilt, and the state concedes that, if the confession should have been excluded from evidence, its admission constituted prejudicial error.

The murder of Michael Posthuma took place on June 9, 1975. Initially, it appears that there was no evidence of Schilling's complicity in the murder. He was, however, believed to have been in association with persons suspected of the murder at or about the time it took place. He was initially taken into custody as a material witness in connection with the drug transaction with which the deceased Posthuma and the suspects were involved.

At the request of Dane county authorities, the defendant was taken into custody in Dodge county at approximately 12:01 a.m. on June 13, 1975. He at that time was given the first of six *Miranda* warnings. The officer of the Dodge county sheriff's department who took him into custody immediately read Schilling his constitutional rights as set forth in *Miranda* and returned him to Dane county. It is acknowledged, however, that the statement

of rights did not advise the defendant that, although he initially agreed to talk and did talk, he could cease answering questions at any time. The questions asked of Schilling by the Dodge county officer were not, however, of an inculpatory nature. Moreover, after Schilling was returned to Dane county, he was correctly advised of his right to stop interrogation at any time, but he never asserted that right.

Schilling was delivered to the Dane county jail at approximately 1:20 a.m. on the morning of June 13, 1975. Prior to any interrogation, Officer JoAnne Platte of the Dane county sheriff's department advised Schilling of his rights and read to him the full *Miranda* warnings, including the warning that he could halt questioning at any time. Officer Platte testified that she went through each of the rights individually and asked Schilling whether he understood them. He replied affirmatively in respect to each of them. At approximately 1:55 a.m., prior to the commencement of any questioning, Schilling, in the presence of witnesses, signed the waiver form attached to the *Miranda* warnings. That waiver consisted of the following statement:

"I have read the statement of my rights shown above. I understand what my rights are, I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me."

Thereafter Schilling was questioned from about 2:00 a.m. until 4:00 a.m. Schilling repeatedly told the officers that he wished to cooperate with them. He never stated or intimated that he wished to exercise any of the rights he knew to be set out in the *Miranda* warnings. During this two-hour session, the defendant admitted that he was instrumental in setting up a sale of half a ton or a ton of marijuana to Posthuma.

Thereafter, at about 4:00 a.m., Detective Thomas J. Kretschman, a narcotics officer with the Dane county sheriff's department, interrogated him further in respect to the details of the marijuana transaction. Detective Kretschman again advised Schilling of his constitutional right to counsel and of his right to remain silent and repeated the full *Miranda* warnings. Schilling stated that he understood his rights and proceeded to answer Kretschman's questions.

Kretschman said that the defendant was cooperative and appeared to be attempting to help the authorities in respect to the drug transaction. After this interrogation defendant was booked on the charge of delivery of a controlled substance—party to a crime. Because the defendant expressed concern for his safety if he were at liberty, he was kept in the Dane county jail.

Detective Kretschman resumed questioning between 7:30 and 8:30 a.m. on the morning of June 13. He did not at that time again advise Schilling of his *Miranda* rights. Apparently nothing new was elicited in this session, but again Schilling evinced no reluctance to answer questions and never indicated that he wished to exercise the *Miranda* rights, which by then had been read to him at least three times.

Detective Kretschman again spoke to the defendant on the evening of June 13. At that time Schilling told Kretschman that he had been contacted by Legal Services and had been advised by Robert A. Christensen, an attorney with Dane County Legal Services at about 10 a.m. on the morning of June 13. Schilling said he was told by Attorney Christensen not to discuss anything with the police officers. It thus appears that Schilling was again advised of his right to remain silent by his own attorney.

Although Assistant District Attorney John Burr, at least by the afternoon of June 13, knew that Attorney Christensen was representing Schilling, Burr did not in-

form anyone in the sheriff's office of that representation.

When Schilling told Detective Kretschman that he had counsel and said he had been advised to keep silent, the detective told Schilling that he did not have to continue talking with him, but the defendant at this point apparently expressed an interest in securing more information from Kretschman about court procedures and initiated further conversation. The defendant appeared cooperative and willingly gave additional information about the drug transaction.

Another interrogation session commenced in the early afternoon of June 14. Schilling once more was fully and accurately advised of his rights under *Miranda.* He stated, however, that he understood his rights but nevertheless was willing to talk. Additionally, he was given a printed card which stated the *Miranda* admonitions, and Schilling read it. He was then taken to locations in Dane county where he had previously stated the drug transaction took place. During the course of this automobile tour, he answered questions. However, when, at about 1:20 p.m., the officers asked to have his statement tape-recorded, he refused to give that permission.

He was returned to the sheriff's office, and late in the afternoon questioning was resumed. At this point, officers of the Madison police department stated that they wished to take a tape-recorded statement. Schilling told the officers that he wanted his attorney to be notified if he was required to make either a written or taped statement. Thereafter, no request for either a written or taped statement was made by any of the questioning authorities, and no written or taped statement was ever taken.

There were numerous breaks in the questioning. The defendant was offered food and was permitted to use the restroom. He declined any food but was given a glass

of Seven-Up. At 6:55 p.m. he asked for, and was given, two aspirin tablets. After a break, he stated that he wished to continue with the questioning. The questioning continued until about 7:50 p.m.

After a break in interrogation of about forty-five minutes, Schilling was questioned by Detective Charles Lulling of the Madison police department. Before any questions were asked, Lulling gave Schilling complete *Miranda* warnings and told Schilling that he had the right to counsel and that he had the right to remain silent. The defendant stated that he understood, his rights and that he did not mind further interrogation. At the suppression hearing, Detective Lulling testified that he carried the conversation further so he could assure himself that the defendant fully understood his rights. Lulling testified that Schilling appeared to be in a state of composure at this time.

At the suppression hearing, Lulling acknowledged that he obtained the confession from the defendant by stating that some of Schilling's statements did not make sense and by revealing that Posthuma's wallet had been found at McDonald's Restaurant, where Schilling had previously stated he had met his wife on the night of the alleged drug transaction. Lulling stated that it was possible that the defendant's fingerprints would be found on the wallet. It was at this point, according to Lulling, that the defendant said, "Oh God! God! I did it. I did it. I did it." In response to Lulling's question, "You did what?" Schilling said, "I stabbed him." At this time, according to Lulling, Schilling became agitated, turned pale, and sobbed intermittently. Schilling then went on to describe the events of the murder but stated that he believed Posthuma was already dead from hammer blows administered by another party to the drug transaction. He admitted, however, that he stabbed Posthuma repeatedly and that he was trying to make it look like "something else."

Two other detectives were called to the interrogation room, and each of the significant admissions made to Lulling was repeated to the three officers. The defendant requested that he be allowed to call his wife, and additional incriminating statements were made in the course of this call. Because of his lack of composure at this time, he was not asked to sign another waiver of rights, but at no time did Schilling state that he wished to discontinue the interviews.

At approximately 10:30 p.m. he had regained his composure and asked Lulling what the penalty was for first-degree murder. Later that evening Schilling was taken to the murder site and again confirmed his participation in the stabbing of Posthuma. After this tour, he was asked to make a written statement, but he declined, stating that he would have to contact his attorney before giving either a written or video-taped confession.

Prior to trial a hearing was held on the motion to suppress Schilling's oral confession. Following the hearing, the court entered an order denying the motion to suppress and in a memorandum opinion made specific findings that the defendant was informed of his constitutional rights and had voluntarily, freely, and knowledgeably waived those rights. The following findings appear in the opinion:

(1) Defendant had counsel prior to interrogation on June 14 and knew he had counsel; (2) counsel was not notified of the interrogation or given a chance to be present; (3) defendant was repeatedly advised of his right to counsel, his right to counsel during questioning, his right to remain silent, and that what he *said* could be used against him in court; (4) at all times defendant stated he understood his rights; (5) defendant asserted his desire to have counsel if any taped or written statements were to be taken; (6) he periodically indicated a desire to continue the interviews on June 14 and at no time asked to call his attorney; (7) the great bulk of

defendant's statements were exculpatory concerning the homicide until the session with Lulling and were conceived to divert the police from a suspicion of his involvement in the robbery and homicide; (8) defendant knew his rights and voluntarily, freely, and knowledgeably waived his rights; and (9) during the course of questioning on June 14, 1975, there were had several breaks in the questioning process with food and drink made available to the defendant.

At trial the officers who elicited the confession testified as they did at the suppression hearing. In addition, there was medical testimony that there were 24 knife wounds on Posthuma's body, including defensive wounds to the hand as a result of fighting off the knife blows. It was determined that a knife wound to the trunk was the cause of death. The finding of guilt, conviction, and sentencing followed.

The record shows that, from the time defendant was taken into custody in Dodge county to the time he confessed to Officer Lulling, he was advised of his *Miranda* rights at least six times.[1] One of these admonitions—the one given by the initial custodial officer of the Dodge county sheriff's department—was defective in that it did not advise him of the right to stop the questioning; but it is eminently clear that constitutionally antiseptic *Miranda* warnings were administered at every crucial stage of the interrogation, and in each instance there was further questioning to determine whether or not Schilling understood those rights.

On this appeal the Public Defender asserts that Schilling was deprived of his sixth-amendment right to counsel as set forth in *Massiah v. United States,* 377 U.S. 201 (1964), as well as the right to counsel during custodial interrogation recognized by *Miranda v. Arizona,* 384 U.S. 436, 469–71 (1966). While the state argues

[1] In this court we include the advice given by counsel, Robert Christensen.

that the constitutional sixth-amendment right to counsel under *Massiah* did not attach because "adversary criminal proceedings" had not yet commenced, we consider that contention irrelevant. We need not determine in this case whether the right to counsel stems from the constitutional rights explained in *Massiah*, for under *Miranda* Schilling had the undoubted right to counsel from the onset of custodial interrogation. Moreover, the standard for waiver of counsel afforded by the sixth amendment is the same as that for the waiver of counsel under the rights set forth in *Miranda*. A comparison of *Brewer v. Williams*, 430 U.S. 387 (1977), and *Johnson v. Zerbst*, 304 U.S. 458 (1938), with *Miranda* makes this apparent, for, when the Supreme Court set the standards for waiver in *Miranda*, it relied upon *Johnson v. Zerbst*, a sixth-amendment case. Accordingly, the principal issue in this case is whether Schilling waived the right to counsel and waived his right to be silent under the standards of *Miranda*. The burden upon the state and the standard for the waiver of the right to counsel are set forth in *Miranda*, at 475:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, n. 14. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders."

*Miranda* also went on to state that the mere silence of the accused after the warnings are given does not

constitute a waiver of rights, nor is the answering of some questions a waiver of the right against self-incrimination if the privilege to remain silent is invoked. A lengthy interrogation is a factor which militates against a finding of a valid waiver, and "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda,* at 476. The requirements of *Miranda* that there be a warning and a waiver are not to be viewed by interrogating officers as "simply a preliminary ritual to existing methods of interrogation." (at 476) The state has a heavy burden to prove a knowing and an intelligent waiver, and the waiver must be voluntary.

This court, in applying the *Miranda* rationale, has established a procedure which must be followed when the state seeks to prove a waiver of *Miranda* rights. In *State v. Hernandez,* 61 Wis.2d 253, 212 N.W.2d 118 (1973), we held:

"[T]he state has the obligation to establish that the defendant was informed of his constitutional rights as set forth in *Miranda,* that he understood them and intelligently waived them. . . .
"The state has the burden to establish these facts beyond a reasonable doubt." (at 258)

In *Hernandez,* the court stated that the initial burden is upon the state and that, where a prima facie case of warning and waiver is made out, a statement should be admitted on this prima facie evidence. In *Hernandez,* at 259, we stated:

"[A]s a generalization to the *Miranda* question . . . when the state has established that defendant has been told or has read all the rights and admonitions required in *Miranda,* and the defendant indicates he understands them and is willing to make a statement, a prima facie case (case is used in the limited sense of the issue at hand) has been established."

While the state has the burden "to show beyond a reasonable doubt that statements or confessions are admissible, on review by this court the test is whether the findings by the trial court were contrary to the great weight and clear preponderance of the evidence." *State v. Parker*, 55 Wis.2d 131, 135, 197 N.W.2d 742 (1972). *See also, Roney v. State*, 44 Wis.2d 522, 533, 171 N.W.2d 400 (1969), and *State ex rel. Goodchild v. Burke*, 27 Wis.2d 244, 133 N.W.2d 753 (1965).

The question for this court, then, is whether the findings of the trial court supporting the conclusion that Schilling, beyond a reasonable doubt, waived his right to remain silent and to have counsel present are contrary to the great weight and clear preponderance of the evidence.

In the instant case the state established that the defendant was accurately and completely advised of all of his *Miranda* rights on at least four occasions, including a warning given immediately prior to the interrogation in which the defendant confessed to the murder; and on each occasion he stated he understood the warning and was willing to talk. He was also given an additional warning which was defective in that he was not told of his right to stop the questioning, but in fact no questioning followed that defective warning. Beyond a reasonable doubt, the state established a prima facie case.

The defense did not present any witnesses. Through cross-examination, however, it attempted to convince the trial court that, under the circumstances, facts were evident which would lead to the conclusion that the defendant did not knowingly, intelligently, or voluntarily waive his rights.

Although, on the basis of the facts above, it is evident that the trial court was able to conclude beyond a rea-

sonable doubt that the warnings were given and the rights expressly waived, we consider in turn each of the arguments asserted on appeal by counsel.

Counsel asserts that, in circumstances such as this, where the prosecutorial authorities knew the defendant had counsel and knew that he had been told not to discuss the case with police, a subsequent statement was constitutionally inadmissible. It is also asserted that there could be no valid waiver because the defendant's refusal to give a written or recorded statement while at the same time being willing to make oral admissions was indicative of the defendant's misunderstanding of the law. Therefore, it is argued, the waiver could not have been intelligent. Counsel also asserts that the waiver of rights was not voluntary because the police officer's comments about the wallet of the victim were for the purpose of tricking the defendant into confession. It is also argued that the overall length of the custody from 12:01 a.m. on June 13, 1975, to the time of confession at approximately 9:00 p.m. on June 14—a period of forty-five hours—was evidence that the accused did not voluntarily waive his rights.

The Public Defender on this appeal specifically disclaims a *per se* exclusionary rule whereby any statement obtained in counsel's absence after the defendant retained counsel would be suppressed. The Public Defender nevertheless asserts that an unusually heavy burden falls upon the state in the circumstances here and that the state has not assumed the burden of showing an intentional and voluntary waiver of counsel's presence. Despite disclaimer of a *per se* rule, reliance is placed upon a New York case, *People v. Tompkins*, decided by the New York Court of Appeals on July 13, 1978, a case which has been referred to us by the submission of a copy of a New York State Court Criminal Law Review. It is apparent, however, that the *Tompkins* case is found-

ed upon the rationale of *People v. Hobson,* 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976), which probably constitutes the strongest version of the *per se* rule applied anywhere. In *People v. Hobson,* at 484, the court said:

"The rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary."

Although the Public Defender on this appeal disclaims the *per se* rule, it is evident that he relies upon it. That rule, however, is inconsistent with the holdings of the great majority of the courts in the United States. Even those courts which to some extent recognize a version of a *per se* exclusionary rule have concluded that a waiver of the right to counsel is permitted. *United States ex rel. O'Connor v. New Jersey,* 405 F.2d 632 (3d Cir. 1969), *cert. denied* 395 U.S. 923, and *Hancock v. White,* 378 F.2d 479 (1967), suggest that interrogation without counsel *following indictment* requires exclusion of any incriminating statements obtained. Nevertheless, *O'Connor* recognizes the applicability of the doctrine of waiver if "clear, explicit, and intelligent." (at 636)

While *United States v. Smith,* 379 F.2d 628, 633 (7th Cir. 1967), *cert. denied* 389 U.S. 993, indicated in dicta that *Miranda* precludes "as unconstitutional the admission of statements resulting from in-custody interrogation *after known retainer or appointment of counsel* and without counsel's presence or approval," it qualified that statement by saying that, even under such circumstances, the accused could deliberately and understandably choose to forego the assistance of counsel at interrogation.

Subsequently, *United States v. Durham,* 475 F.2d 208 (7th Cir. 1973), and *United States v. Springer,* 460 F.2d

1344 (7th Cir. 1972), *cert. denied* 409 U.S. 873, made clear that there is no *per se* rule which excludes statements made without notice to, or consent of, an earlier retained counsel. *Springer* indicated, at 1350, that under these circumstances, however, there must be a clear case of waiver. We fail to see what these cases add to Wisconsin law, which requires that a waiver of the right to counsel during interrogation, like the waiver of the right to remain silent, must be proved beyond a reasonable doubt.

These cases are, however, instructive in showing that a *per se* rule has been rejected by the Seventh Circuit and that the right to the presence of counsel during interrogation after a defendant has been arrested and charged can be waived in the absence of counsel. This position is persuasively discussed in *U. S. ex rel. Chabonian v. Lief*, 366 F. Supp. 72, 80 (E.D. Wis. 1973). That case granted habeas corpus in respect to a conviction previously affirmed by this court in *State v. Chabonian*, 50 Wis.2d 574, 185 N.W.2d 289 (1971). The dissenters in this court, who contended that the statements were inadmissible, did so on the basis of their disagreement with the majority's position that the statement was volunteered; but they recognized that such statements would have been admissible had there been a showing of a " 'clear and explicit' waiver" of the right to have counsel present. See, *Chabonian, supra* at 594. Thus it is the unanimous position of this court that waiver of the right to have prior-retained counsel present at interrogation is sustainable where the waiver is clear.

The fact, then, that a defendant has counsel does not automatically require exculsion of a statement obtained from him in counsel's absence provided the defendant knowingly, intelligently, and voluntarily waived his

rights. The restatement of the standard for waiver in *Springer, supra,* that it must be "clear" and the standard used in *State v. Chabonian* that the waiver must be "clear and explicit" sets no higher standard than that of *Miranda.* That standard, as set forth above, is the "heavy burden" on the state to show beyond a reasonable doubt a knowing, intelligent, and voluntary waiver.

The defendant in this case was told of his rights by the police officers at least five times. He was additionally admonished by his counsel to remain silent. In response to the *Miranda* warnings given him, he said he understood them and that he was willing to talk. On several occasions, police officers continued with additional questioning to make sure that he did in fact understand the *Miranda* warnings. An express waiver was proved beyond a reasonable doubt, and the findings by the trial court in arriving at that conclusion are not contrary to the great weight and clear preponderance of the evidence. Under any test, there was an explicit waiver of the right to counsel and the right to remain silent.

It is also the argument of the Public Defender that a possible mistake in Schilling's understanding of the law made his waiver unintelligent. To recapitulate the facts, the evidence shows that Schilling was advised by counsel not to discuss anything with the police. However, he continued to talk even after the officers told him he did not have to. On June 14, the defendant construed or misconstrued, without any prompting by the police, that the advice of his counsel was not to give any *written* or *taped* statement without his counsel being present. The Public Defender's argument seems to be that Schilling misunderstood the law in that he thought that only a written or taped statement could be used against him. This asserted interpretation flies in the

face of the facts of record. The defendant was repeatedly given the *Miranda* warning that anything he *said* would be used against him. There was nothing to suggest that the police officers in any way indicated that an oral statement could be given with impunity and that only a written or taped statement could be used against him. The record is to the contrary. He was specifically informed that anything said could be used against him, and the trial court in its findings underlined *"said"* to emphasize that Schilling repeatedly had been warned correctly.

While the Public Defender argues that the defendant misunderstood the law, the record does not bear that out. Soon after making the oral confession, he asked Detective Lulling what the penalty was for first-degree murder. It is apparent that he did not in fact misapprehend the law but knew the consequences of his oral confession.

Even were there an apparent mistake of law, we find no support for the assertion of the Public Defender that a mistake of law vitiates the waiver. The Public Defender relies upon *Frazier v. United States,* 419 F.2d 1161 (D.C. Cir. 1969), which was specifically overruled by an *en banc* decision of the court, *United States v. Frazier,* 476 F.2d 891 (D.C. Cir. 1973). In the *en banc* opinion, the District of Columbia court specifically rejected the theory that an apparent mistake of law by the defendant either calls for legal advice by the police or requires exclusion of a confession. The court said that the giving of legal advice by interrogating officers is neither called for by *Miranda* nor likely to aid defendants. The Fourth Circuit in a later case reached the same conclusion, stating:

"But police officers cannot act as counsel even if the burden were properly theirs, and it is not. When the

police have fully and fairly given a suspect the *Miranda* warnings their duty is discharged, and we hold that they are under no further and additional duty whether or not the suspect acts wisely or foolishly or misapprehends either the facts or the law." *Harris v. Riddle,* 551 F.2d 936, 938–39 (4th Cir. 1977).

We conclude that, where the defendant was repeatedly given explicit *Miranda* warnings and where, after questioning, he indicated he understood his rights and was willing to talk, he cannot now assert that his waiver of rights resulted from a misapprehension of the law. The interrogating authorities fully complied with their duty to explain his constitutional rights. As the Fourth Circuit Court correctly stated, they had no further or additional duty once the warnings were given.

The Public Defender also suggests that the waiver of rights may not have been voluntary, because the interrogating officer referred to Posthuma's wallet, on which the officer suggested the defendant's fingerprints might be found. *Miranda* states that evidence of trickery would tend to show that a defendant did not voluntarily waive a privilege against self-incrimination. However, the confrontation of a defendant with possible incriminating evidence is not sufficient to undermine the voluntariness of a waiver of the privilege against self-incrimination. *United States v. Poole,* 495 F.2d 115, 121 (D.C. Cir. 1974). The mere statement of what happened in respect to the wallet, as it is recounted in the defendant's brief, demonstrates that the occurrence cannot be fairly denominated as trickery. Defendant's counsel states:

"Lulling testified that he obtained the confession from the defendant by emphasizing the fact that Posthuma's wallet had been found at the McDonald's restaurant where the defendant stated he met his wife on the night of the alleged drug transaction, and that it was possible that the defendant's fingerprints would be found on the

wallet. It was at that point that the defendant said, 'Oh God! God! I did it. I did it. I did it.' "

As the Public Defender correctly states the facts, the officer did not claim that Schilling's fingerprints had been found on the wallet. Such statement indeed would have been a misrepresentation. He merely speculated on the possibility that Schilling's fingerprints would be found on the wallet.

While the questioning was adroit and suggestive, it was not trickery and was not of a nature to override or overbear the will of the defendant in a manner to make the waiver of rights or the confession itself involuntary. Because there was no misrepresentation, we do not reach the question in this opinion, but the United States Supreme Court in *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), has held that even an actual misrepresentation by an interrogator does not ipso facto make a confession inadmissible.

The Public Defender also argues that the length of the interrogation is evidence not only of involuntariness but evidence that the accused did not validly waive his rights. *Miranda* stated, at 476:

"Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege."

The length of interrogation, however, is but one of the factors to be considered in determining whether the waiver is knowing, intelligent, and voluntary. Even a lengthy interrogation is not conclusive on the question.

Moreover, the waiver of rights was initially executed by the defendant within a comparatively few minutes after his custody in the Dane county jail commenced. The *Miranda* warnings were given repeatedly and under circumstances where the trial court found there had been "several breaks in the questioning process with food and drink made available to the defendant."

The record also shows that the defendant himself initiated further conversations and questions after the interrogating officers advised him that he did not need to speak with them further. While the course of interrogation in its entirety covered a considerable number of hours, interrogation was not continuous. It involved two separate crimes. The record is free of any evidence of coercion, and in the totality of the circumstances there is no evidence to show that the confession was anything but voluntary. The record considered as a whole shows no coercion or involuntariness in the waiving of defendant's rights. Rather, it demonstrates convincingly that, after being fully advised, Schilling knowingly, intelligently, and voluntarily waived his right to remain silent and to have counsel present.

We affirm the judgment of conviction and the order which denied the defendant's postconviction motions. The only error of significance urged to set aside either the conviction or the order denying postconviction motions was the admission of the allegedly coerced or involuntary confession. The confession was properly admitted into evidence.

*By the Court.*—Judgment and order affirmed.