IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MIRANDA-HENRIQUEZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

OSCAR A. MIRANDA-HENRIQUEZ, APPELLANT.

Filed May 26, 2020.    No. A-19-641.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed as modified.

Thomas C. Riley, Douglas County Public Defender, and Allyson A. Mendoza for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Oscar A. Miranda-Henriquez appeals his conviction for two counts of first degree sexual assault on a child and two counts of third degree sexual assault on a child. He contends that the district court erred in (1) denying his motion to suppress statements he made during a police interview, (2) failing to grant his motion for a directed verdict, and (3) imposing excessive sentences. For the reasons set forth here, we affirm Miranda-Henriquez' convictions and sentences as modified.

## II. STATEMENT OF FACTS

### 1. POLICE INTERVIEW

In March 2018, Omaha Police Detective Shannon Knuth interviewed Miranda-Henriquez after receiving a report alleging Miranda-Henriquez sexually assaulted his daughter, S.M., and his niece, E.R. Knuth conducted the interview in Spanish and began by asking Miranda-Henriquez biographical questions about members of his family. After establishing that Miranda-Henriquez could understand her, Knuth then told Miranda-Henriquez that she was going to read him his *Miranda* rights. Miranda-Henriquez responded his surname was Miranda, and Knuth asked if he knew what *Miranda* rights were, to which he replied, "no." Knuth then told Miranda-Henriquez that she was going to read his *Miranda* rights to him and that he needed to say yes or no. Knuth read the *Miranda* rights from an Omaha Police Department Rights Advisory Form which listed the rights in Spanish. After each right was read, Knuth asked if Miranda-Henriquez understood the right; he immediately responded "yes." Following that exchange, Knuth asked, "Do you want to talk to me right now?" and Miranda-Henriquez responded "yes."

As the interview continued, Miranda-Henriquez admitted to inappropriately touching S.M. and E.R. Concerning S.M., Miranda-Henriquez stated that when S.M. was around 11½ years old, he inserted his penis into S.M.'s vagina and ejaculated. Miranda-Henriquez also admitted that, on another occasion, he inappropriately touched S.M. by placing his hand under her clothing and touching her between the labia. Regarding E.R., Knuth told Miranda-Henriquez that E.R. had reported that he ejaculated on her and used a towel to clean her off. Miranda-Henriquez stated that he remembered the incident, even the towel, and admitted to attempting to penetrate E.R. with his penis but was unable to, so he placed his penis inside her labia and masturbated until he ejaculated on her.

During the interview, Miranda-Henriquez stated that his wife was aware of his conduct and that he knew his actions were "against the law." After Miranda-Henriquez admitted to inappropriately touching S.M. and E.R., Knuth asked Miranda-Henriquez if he had any questions for her, and Miranda-Henriquez inquired about his phone and his car. Later in the interview, Knuth asked if Miranda-Henriquez understood her and he nodded his head affirmatively. Throughout the interview, Miranda-Henriquez stated he would accept punishment for his actions.

In April 2018, Miranda-Henriquez was charged with two counts of first degree sexual assault on a child, Class IB felonies, and two counts of third degree sexual assault on a child, Class IIIA felonies. See, Neb. Rev. Stat. § 28-319.01(2) (Reissue 2008 and Reissue 2016); Neb. Rev. Stat. § 28-320.01(3) (Reissue 2016). The information was twice amended regarding the dates of the alleged offenses. The first degree sexual assault on a child offense regarding S.M. was alleged to have been committed on or about August 25, 2014, through March 8, 2018. The first degree sexual assault on a child offense regarding E.R. was alleged to have been committed on or about November 25, 2006, through November 25, 2011. The third degree sexual assault on a child offense regarding S.M. was alleged to have been committed on or about August 1, 2006, through August 26, 2010. The third degree sexual assault on a child offense regarding E.R. was alleged to have been committed on or about November 25, 2006, through November 25, 2011.

## 2. Motion to Suppress

Miranda-Henriquez moved to suppress his statements to Knuth because, relevant to this appeal, he was not properly advised of his right to counsel and his right against compelled self-incrimination; he had not knowingly, voluntarily, or intelligently waived his right to counsel or his right against compulsory self-incrimination; and his statements were not voluntary. At the suppression hearing, Knuth testified and the court received into evidence the audio-video recording of Knuth's interview with Miranda-Henriquez. The district court later entered an order denying Miranda-Henriquez' motion finding Miranda-Henriquez knowingly and voluntarily waived his *Miranda* rights.

## 3. Trial

A bench trial was held in April 2019 during which Miranda-Henriquez renewed his motion to suppress his statements, and the district court again denied his motion but granted him a continuing objection. The evidence at trial established that Miranda-Henriquez was born in May 1978; S.M., a victim and daughter of Miranda-Henriquez, was born in August 2004; and E.R., a victim and niece of Miranda-Henriquez, was born in November 2000. At trial, testimony was adduced from Kelly Varguez, a court-certified interpreter; Knuth; E.R.; S.M.; and Sarah Cleaver, a pediatric nurse practitioner at Project Harmony Child Advocacy Center.

### (a) Recording of Police Interview/Kelly Varguez

The district court received into evidence the audio-video recording of Knuth's police interview of Miranda-Henriquez over Miranda-Henriquez' objection and renewal of his motion to suppress. Varguez, a certified Spanish court interpreter, testified that she viewed the recorded interview between Knuth and Miranda-Henriquez and provided a transcript, which was also received into evidence. The transcript included a Spanish-to-English translation of the interview. When asked if she believed Miranda-Henriquez had difficulty understanding Knuth, Varguez testified that there were "a couple of instances where she may have asked one question and he answered with information that she wasn't anticipating" but that Knuth clarified those misunderstandings.

### (b) Detective Knuth

Knuth testified that she received an assignment to interview Miranda-Henriquez because he only spoke Spanish and she is fluent in Spanish and holds a Limited English Proficiency certification through the City of Omaha. Although Knuth did not ask Miranda-Henriquez if his native language was Spanish, she began the interview by asking some biographical questions to see whether Miranda-Henriquez understood her and testified that she believed Miranda-Henriquez understood her. Additionally, toward the beginning of the interview, Knuth read Miranda-Henriquez his *Miranda* rights, and Knuth testified that, in her opinion, Miranda-Henriquez understood the rights she read to him and willingly waived his rights and agreed to speak with her. The interview with Miranda-Henriquez lasted a little over an hour, including two breaks, and Miranda-Henriquez never stated that he had any difficulty understanding Knuth. Knuth further testified that she did not make any promises, coerce, or threaten Miranda-Henriquez to get him to answer her questions. Finally, Knuth testified that, as part of the

investigation, she took photographs of the 37th Street house where some of the alleged incidents occurred and testified that all the events she testified to occurred in Douglas County, Nebraska.

(c) S.M.

S.M. testified she lived with her family at a house on South 37th Street and that she had previously lived in a house on Vinton Street. S.M. testified that the first time Miranda-Henriquez touched her inappropriately occurred in 2012 at the house on Vinton Street. At that time, S.M. stated that she was 8 years old, in the first grade, and Miranda-Henriquez used his hand to touch her vagina over her clothing.

S.M. testified Miranda-Henriquez also inappropriately touched her twice at the 37th Street house. S.M. stated the first incident at the 37th Street house occurred when she was 12 years old when Miranda-Henriquez put his hand down her skirt and began rubbing her vagina, then later penetrated her vagina with his penis. S.M. testified that after this incident, Miranda-Henriquez told her that if she ever reported what happened, he would get divorced from her mother. S.M. also testified that, when she was 13 years old, a second incident took place at the 37th Street house during which Miranda-Henriquez penetrated her vagina with his penis and tried to kiss her on the mouth. S.M. testified that she did not tell anyone about Miranda-Henriquez' conduct because, on more than one occasion, he had threatened her to not tell anyone. However, S.M. testified that sometimes Miranda-Henriquez would initiate physical contact, such as a hug or kiss, with S.M. before he would leave to go somewhere, and S.M.'s mother would see S.M. push him away, which upset S.M.'s mother. This prompted S.M. to disclose the abuse to E.R. and eventually report to the police that Miranda-Henriquez had abused S.M.

After reporting Miranda-Henriquez' conduct, S.M. spoke with a nurse at Project Harmony but only disclosed the first two incidents and called one incident an "accident." S.M. testified that she did not discuss everything that happened because "I'm not used to telling them everything because I don't trust them" and was afraid something would happen to her.

(d) E.R.

E.R. testified Miranda-Henriquez lived with her family on Castelar Street in Omaha from 2005/2006 to 2009/2010 and that Miranda-Henriquez sexually assaulted her on three or four occasions during that time. E.R. stated the first incident occurred when she was either 5 or 6 years old and in kindergarten. E.R. testified that she and Miranda-Henriquez were in a bedroom at her house when he penetrated her vagina with his penis, ejaculated, and then wiped away "the substance" from her vagina. E.R. also recalled that an incident occurred in 2006 or 2007 where Miranda-Henriquez touched her vagina over her clothing while she was buckled in his truck. When E.R. was approximately 6 or 7 years old, Miranda-Henriquez penetrated her vagina with his penis in the living room of her house. E.R. testified that on another occasion in 2008 or 2009, Miranda-Henriquez began touching "around" her breast area, but she told him to stop and that she was going to tell her parents. Miranda-Henriquez complied but threatened that if she informed her parents then he would tell them about a different matter that would result in her being punished. When asked why she decided to report these incidents that occurred 10 to 12 years ago, E.R. explained that she felt it was time to speak up because someone else was going through the same thing.

(e) Sarah Cleaver

In March 2018, Cleaver performed examinations on S.M. and E.R. In connection with her examination, Cleaver gathered information from S.M.'s forensic interview where S.M. disclosed Miranda-Henriquez engaged in penile-vaginal contact and digital-vaginal contact with S.M., and then initiated a conversation with S.M. to help formulate a plan for the family. This plan included seeking a trauma-informed therapist with specific training in sexual abuse. Cleaver testified she also gathered information from E.R.'s forensic interview, where E.R. likewise disclosed penile-vaginal contact, and Cleaver separately initiated a conversation with E.R. to generate a plan for E.R. that included working with a trauma-informed therapist. During her testimony, Cleaver also discussed a phenomenon that she referred to as "delayed disclosures," which she explained referred to the fact that children typically do not disclose their abuse at the time it happens, and noted that delayed disclosures are very common in sexual abuse cases. Cleaver expounded that often disclosures are done in a progressive form, with small quantities of information revealed in intervals so that the discloser can see how the information is received before providing more detailed information.

(f) Conclusion of Bench Trial and Verdict

At the close of the State's case, Miranda-Henriquez moved for a directed verdict on all four counts. Specifically, regarding counts I and II, first degree sexual assault on a child and third degree sexual assault on a child both involving victim S.M., Miranda-Henriquez argued that the State had failed to prove that Douglas County provided the proper venue for the proceeding. The district court denied Miranda-Henriquez' motion for directed verdict. The defense did not present any evidence and, after submission, the district court found Miranda-Henriquez guilty of the charged offenses.

4. SENTENCING

The district court sentenced Miranda-Henriquez to 50 to 60 years' imprisonment each for the two convictions of first degree sexual assault of a child, including a mandatory minimum sentence of 15 years' imprisonment. The court also sentenced Miranda-Henriquez to 2 to 3 years' imprisonment for each of the two convictions of third degree sexual assault of a child. The sentences were ordered to be served consecutively, and Miranda-Henriquez was given credit for 458 days previously served. The court further determined that Miranda-Henriquez' two convictions for first degree sexual assault on a child were aggravated offenses requiring Miranda-Henriquez to register as a sex offender for the rest of his life. The court's subsequent written sentencing order failed to set forth that Miranda-Henriquez' convictions for first degree sexual assault of a child carry 15-year mandatory minimum sentences.

III. ASSIGNMENTS OF ERROR

Miranda-Henriquez argues the district court erred in (1) denying his motion to suppress statements because he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights; (2) denying his motion for directed verdict; and (3) imposing excessive sentences.

## IV. STANDARD OF REVIEW

When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019). In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda*, an appellate court applies a two-part standard of review. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *Id.*

In a criminal case, the court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Miranda-Henriquez first contends the district court erred in denying his motion to suppress his statements made to Knuth because he did not knowingly and voluntarily waive his *Miranda* rights. Miranda-Henriquez argues that during his conversation with Knuth he expressed his confusion but no safeguards were taken to clarify the nature of the waiver. Additionally, Miranda-Henriquez contends that Knuth was required to "familiarize him with the nature of *Miranda* rights and the consequences of waiving them." Brief for appellant at 14. After reviewing the evidence, we conclude Miranda-Henriquez knowingly and voluntarily waived his *Miranda* rights.

"*Miranda* [*v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966),] prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates that its agents used procedural safeguards that are effective to secure the privilege against self-incrimination." *State v. Ball*, 271 Neb. 140, 156, 710 N.W.2d 592, 606 (2006). "Specifically, authorities must advise an individual in custody that he has the right to remain silent and the right to an attorney." *State v. Goodwin*, 278 Neb. 945, 956, 774 N.W.2d 733, 743 (2009).

> *Miranda* rights can be waived if the suspect does so knowingly and voluntarily. A valid *Miranda* waiver must be voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. In determining whether a waiver is knowingly and voluntarily made, a court applies a totality of the circumstances

test. Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct.

*State v. Goodwin*, 278 Neb. at 956, 774 N.W.2d at 743.

Miranda-Henriquez makes two separate arguments here in relation to a knowing and voluntary waiver. First, he argues that, when he expressed a lack of familiarity with "*Miranda* rights" in response to Knuth's specific questions of his familiarity with those rights, at that point, it was incumbent upon Knuth to expound upon and familiarize him with the nature of those rights and Knuth's failure to do so resulted in the lack of a knowing and voluntary waiver. Second, Miranda-Henriquez argues that the totality of the interview suggests that he was confused about his rights and that the record demonstrates a lack of a knowing and voluntary waiver.

Regarding Miranda-Henriquez' first argument, he does not argue that a properly formulated *Miranda* warning was not provided to him and the record reflects that a properly formulated warning was provided to him prior to the interview. Instead, Miranda-Henriquez argues that his disclosure of his prior lack of familiarity with those rights required Knuth to better familiarize him in order to make his waiver knowing and voluntary. However, both the U.S. Supreme Court and the Nebraska Supreme Court have rejected that argument.

In *Colorado v. Spring*, 479 U.S. 564, 577, 107 S. Ct. 851, 859, 93 L. Ed. 2d 954 (1987), the U.S. Supreme Court held that "The warning, as formulated in *Miranda,* conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it." In recognition of the same principle, the Nebraska Supreme Court held in *State v. Norfolk*, 221 Neb. 810, 817-18, 381 N.W.2d 120, 126-27 (1986):

> As expressed by the New York Court of Appeals: "Although a suspect must be apprised of his or her rights, providing a general legal education is not the business of the police or the courts." *People v. Williams,* 62 N.Y.2d 285, 289, 465 N.E.2d 327, 329, 476 N.Y.S.2d 788, 790 (1984). See, also, *State v. Wurm,* 32 Wash. App. 258, 647 P.2d 508 (1982); *Albright v. State,* 378 So.2d 1234 (Fla. App.1979); *Schilling v. State,* 86 Wis.2d 69, 271 N.W.2d 631 (1978).
>
> A requirement that a defendant comprehend the consequences of a custodial statement would impose a double duty in interrogation by law enforcement personnel--first, administration of the mandatory *Miranda* warning and, second, valid construction, as well as illustrative explanation, of the contents of the *Miranda* warning, including complete and accurate information bearing on the consummate consequence, namely, admissibility of the custodial statement as evidence at a defendant's trial. Imposing such burdensome responsibility on an interrogating officer would be unwise and impracticable.

Having been provided with a properly formulated *Miranda* warning, Miranda-Henriquez' wavier was valid so long as it was made knowingly and voluntarily.

This leads to Miranda-Henriquez' second argument that a review of the recorded interview demonstrates a lack of understanding by Miranda-Henriquez of his *Miranda* rights which should render his admissions made during the interview inadmissible due to Miranda-Henriquez having provided those admissions without a proper grasp of the rights he was giving up.

As mentioned above, Knuth provided Miranda-Henriquez a properly formulated *Miranda* warning, which the U.S. Supreme Court has stated adequately conveys to a suspect the nature of his or her constitutional privilege and the consequences of abandoning it. Once that warning was given, as the Nebraska Supreme Court has explained:

> To be a valid waiver of Miranda rights, the waiver must be "'knowing' and 'voluntary.'" A waiver is "knowing" if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." A waiver is "voluntary" if it is "the product of a free and deliberate choice rather than [through] intimidation, coercion, or deception." The standard for determining voluntariness in the context of a Miranda waiver is the same standard used to determine the voluntariness of confessions. . . . Whether a knowing and voluntary waiver has been made is determined by looking to the totality of the circumstances

*State v. Hernandez*, 299 Neb. 896, 918, 911 N.W.2d 524, 543 (2018).

In *State v. Lamberson*, 26 Neb. App. 642, 921 N.W.2d 879, (2018), when deciding if the defendant waived his *Miranda* rights, we noted the law enforcement interviewer read the defendant his *Miranda* rights and the defendant stated he understood them. The defendant went on to "willingly engage" in a dialogue with the interviewer in which the defendant both asked and answered questions. *Id.* at 658, 921 N.W.2d at 892. We ultimately determined that based on the circumstances, the defendant had waived his *Miranda* rights. *Id*.

Here, the court received into evidence a video recording of Knuth's interview with Miranda-Henriquez that was conducted in Spanish. Throughout the video recording, Miranda-Henriquez responded to Knuth's questions without hesitation, and part way through the interview, when Knuth asked if Miranda-Henriquez understood her, he shook his head affirmatively. During the interview, Knuth read Miranda-Henriquez his *Miranda* rights from the Omaha Police Department Rights Advisory Form, and Miranda-Henriquez stated he understood them. Knuth then asked if Miranda-Henriquez wanted to speak with her and he replied that he did. Later in the interview, Knuth provided Miranda-Henriquez with the opportunity to ask her any questions to which Miranda-Henriquez only inquired about his phone and his car. The record shows Miranda-Henriquez was able to communicate with Knuth and precautions were taken by allowing Miranda-Henriquez to ask questions. Thus, we conclude Miranda-Henriquez understood his rights.

Next, we determine whether Miranda-Henriquez voluntarily waived his rights. In *State v. Hernandez*, *supra*, the Nebraska Supreme Court addressed the same issue we face now and ultimately concluded the defendant both expressly and impliedly waived his *Miranda* rights. The Nebraska Supreme Court explained:

> An express waiver of a suspect's *Miranda* rights is not required to be made in writing; an oral waiver is sufficient. In addition, the U.S. Supreme Court has said that a *Miranda* waiver need not be express, but can be implied. A "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver," may establish a valid, implied waiver. Thus, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."

As discussed, the evidence shows that [the defendant] understood these rights. Thus, by voluntarily speaking with the investigators, [the defendant] impliedly waived his rights.

Not only did [the defendant's] conduct constitute an implied waiver, but he also validly provided an express oral waiver. When Townsend asked [the defendant] if he would be willing to speak with him, [the defendant] said, "I can try." When asked to sign the rights advisory form to express this waiver in writing, he said, "I guess," and leaned forward to sign before getting sidetracked and moving on to another topic. [The defendant's] statements and conduct constitute an express waiver of his *Miranda* rights.

*State v. Hernandez*, 299 Neb. 896, 919-20, 911 N.W.2d 524, 543-44 (2018).

Here, the evidence establishes that Miranda-Henriquez understood his *Miranda* rights and willingly engaged in a dialogue with Knuth by asking and answering questions. Knuth also testified that she did not make any promises, coerce, or threaten Miranda-Henriquez to get him to answer her questions. Based on the totality of the circumstances we conclude Miranda-Henriquez impliedly waived his rights.

Additionally, the facts of this case are analogous to the facts the Nebraska Supreme Court used in *Hernandez* to conclude the defendant had also expressly waived his rights. Here, after Knuth provided Miranda-Henriquez with a recitation of his *Miranda* rights and asked if he would be willing to speak with her, he replied "yes." Accordingly, based on the totality of the circumstances Miranda-Henriquez also expressly waived his *Miranda* rights. Thus, we find no merit to this assigned error.

## 2. DIRECTED VERDICT

Miranda-Henriquez next argues the district court should have granted his motion for directed verdict because the State failed to prove that two of the counts occurred in Douglas County, Nebraska. He argues that proper venue must be proved by the State like any other fact in a criminal case, and that the State's failure to prove that venue was proper in relation to the incidents involving S.M. entitled him to a directed verdict on those counts. Specifically, Miranda-Henriquez asserts S.M.'s testimony indicated that the counts related to her occurred at the "Vinton Street house" and the "37th Street house," but no testimony was adduced regarding the county in which the two counts occurred.

In Nebraska, criminal cases generally must be tried in the county where the offense was committed. Neb. Rev. Stat. § 29-1301 (Reissue 2016). In the absence of a defendant's waiver of venue, the State has the burden to prove venue beyond a reasonable doubt. *State v. Vejvoda*, 231 Neb. 668, 438 N.W.2d 461 (1989). Venue may be proved like any other fact in a criminal case. *State v. Young,* 279 Neb. 602, 780 N.W.2d 28 (2010). Venue need not be established by direct testimony; if the only rational conclusion which can be drawn from the facts in evidence is that the crime was committed in the county alleged, the proof is sufficient. *Id.* Here, Miranda-Henriquez argues that in connection with its case-in-chief, the State failed to present sufficient evidence that the alleged incidents involving S.M. took place in Douglas County. He does not argue the same principle in relation to the incidents involving E.R.

During trial, S.M. testified that the occasions in which she was sexually assaulted by Miranda-Henriquez took place at the 37th Street house and the Vinton Street house. As part of her investigation, Knuth took photographs of the 37th Street house where the sexual assault allegedly occurred, and Knuth responded affirmatively when asked whether all the events she testified to, which included her investigation of the 37th Street house, occurred in Douglas County, Nebraska. The photographs provided by Knuth were then used by S.M. during trial to identify the location of the assaults within the house. During trial, S.M. was questioned about the location of the houses she lived in and the following testimony was adduced:

Q What's -- do you remember the address?
A [ ] 37th Street.
Q Is that the house that you were living at with your father?
A Yes.
Q Do you recall how long you've lived at that house?
A I don't know.
Q Have you lived in that house your whole life?
A No.
Q Have you lived in other houses here in Omaha?
A Yes.
Q Do you recall the address of the last house you lived in?
A I don't remember.
Q Do you recall any streets it was near?
A Vinton Street.

While S.M. did not specifically testify that the 37th Street house and the Vinton Street house were in Douglas County, S.M. did establish, through this line of questioning that the houses were located in Omaha.

Later, S.M. was asked about when the abuse started and the related details, to which she testified:

Q You stated that you told police that your father had sexually abused you?
A Yes.
Q How many times did that happen?
A I don't remember.
Q Did it happen more than once?
A Yes.
Q Do you remember the first time it happened?
A I think it was when I was eight.
Q Do you remember what year it would have been when you were eight years old?
A I don't remember.
Q We'll walk through maybe a little bit of math. You were born in August of 2004; right?
A Yes.
Q So if we were to jump ahead eight years would it be August of 2012?
A Yes.

Q Do you remember what grade you were in when you were eight?
A I was in first grade.
Q What school would you have been going to in first grade?
A I went to Bancroft Elementary.
Q Do you remember what house you were living at?
A I was in the one on -- the Vinton Street house.

Accordingly, through this line of questioning, S.M. established that she was first assaulted while living at the Vinton Street house during the time she attended school at Bancroft Elementary School, and she was later assaulted while living in the house on 37th Street.

Taken together, the evidence establishes the following: S.M. was assaulted at the 37th Street house and Vinton Street house; Knuth established that the entirety of her investigation involving the assaults took place in Douglas County; S.M. established that both the 37th Street house and the Vinton Street house were located in Omaha, Nebraska; and the Nebraska Supreme Court has previously held that the Douglas County District Court is presumed to know the boundaries of Douglas County and that the City of Omaha is located within it. See, *State v. Liberator*, 197 Neb. 857, 251 N.W.2d 709 (1977) (holding that appellate court could presume that trial court and jury knew boundaries of county where trial took place and that city in question was located in that county); *Gates v. State*, 160 Neb. 722, 71 N.W.2d 460 (1955). After our review of the record, we hold that the only reasonable conclusion which can be drawn from the facts in evidence is that the crimes were committed in Douglas County. Accordingly, the district court did not err in denying Miranda-Henriquez' motion for a directed verdict. This assigned error fails.

### 3. EXCESSIVE SENTENCE

Lastly, Miranda-Henriquez argues the district court abused its discretion in imposing excessive sentences and failing to take into account mitigating factors, such as mentality, lack of criminal record, and social and cultural background.

Regarding criminal sentences, the Nebraska Supreme Court has explained:

> When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. However, the sentencing court is not limited to any mathematically applied set of factors. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

*State v. Manjikian*, 303 Neb. 100, 114-15, 927 N.W.2d 48, 60-61 (2019).

Miranda-Henriquez was convicted of two counts of first degree sexual assault on a child which are Class IB felonies punishable by 20 years' to life imprisonment; however, convictions for first-time offenders pursuant to § 28-319.01 require a mandatory minimum of 15 years' imprisonment. See, Neb. Rev. Stat. §§ 28-105 (Reissue 2008) and 28-319.01(2). See, also, *State v. Russell*, 291 Neb. 33, 863 N.W.2d 813 (2015). Miranda-Henriquez' sentences of 50 to 60 years'

- 11 -

imprisonment with the 15-year mandatory minimums are within the statutory sentencing range for his convictions for first degree sexual assault on a child.

Miranda-Henriquez was also convicted of two counts of third degree sexual assault on a child which are Class IIIA felonies. See, §§ 28-319.01(2) and 28-320.01(3). The penalties corresponding to the Class IIIA felonies include no minimum sentence, a maximum sentence of 5 years' imprisonment, and/or a $10,000 fine. See Neb. Rev. Stat. § 28-105 (Reissue 2008 and Cum. Supp. 2012). Although § 28-105 was amended in 2015 to decrease the penalties for Class IIIA felonies, the Legislature specifically provided that "the changes made to the penalties for Class III, IIIA, and IV felonies by Laws 2015, LB 605, do not apply to any offense committed prior to August 30, 2015, as provided in section 28-116." Neb. Rev. Stat. § 28-105(8) (Supp. 2019). Miranda-Henriquez' sentences of 2 to 3 years' imprisonment are within the statutory sentencing range for his convictions for third degree sexual assault on a child.

At the time of the preparation of the presentence investigation report, Miranda-Henriquez was 40 years old, divorced, with three dependents, and has a sixth grade education that he completed in El Salvador. He came to the United States when he was 25 years old and his criminal history is limited to convictions for following too closely and operating a motor vehicle without a valid license on his person. Miranda-Henriquez scored high in the pro-criminal attitude section of the PSR due to his failure to accept accountability for his actions because, during the PSI interview, he stated he was unsure why he previously admitted to law enforcement that he had penile and digital penetration with both victims and claimed he was innocent. While Miranda-Henriquez had not been assessed for any specialized antisocial behavioral patterns, the PSR noted that he scored in the very high risk range for this subcomponent of the Level of Service/Case Management Inventory (LS/CMI) due to the assaultive nature of the offenses and his denial of culpability. The PSR also indicated a sex offender risk assessment could not be completed because Miranda-Henriquez refused to fully discuss the offenses in this case and his sexual history. Overall the LS/CMI assessed Miranda-Henriquez as a medium-high risk to reoffend.

During the sentencing hearing, the district court noted:

[I]n preparing for this sentencing I reviewed the probation file, including the police reports and the presentence investigation. And in determining an appropriate -- attempting to determine an appropriate sentence, I've considered the defendant's age, mentality, education, experience, social and cultural background, past criminal record, motivation for the offense, the nature of the offense, and the presence or absence of violence.

I believe one of the victims was his daughter and the other was a niece. And in the presentence it says the defendant admitted to law enforcement officers that he did these things with both victims; however, he [ ] now claims that it's not true. It's true. It's true.

It is clear from the record that the district court considered the relevant factors in imposing the sentences in this case. Further, based upon the factors that the sentences imposed were within the statutory sentencing ranges, the severity of the offenses, the harm to the victims, Miranda-Henriquez' failure to take responsibility for the offenses during his PSR interview, his abuse of his position of authority over the victims--his daughter and his niece, and the fact that a lesser sentence would promote disrespect for the law and depreciate the seriousness of his offenses, the district court did not abuse its discretion in the sentences imposed.

However, because the district court's written sentencing order failed to set forth that Miranda-Henriquez' convictions for first degree sexual assault of a child carry 15-year mandatory minimum sentences, we deem it necessary to clarify that inconsistency between the court's oral pronouncement and the court's written order. A sentence validly imposed takes effect from the time it is pronounced. *State v. Marrs,* 272 Neb. 573, 723 N.W.2d 499 (2006); *State v. Tucker*, 17 Neb. App. 487, 764 N.W.2d 137 (2009), *affirmed* 278 Neb. 935, 774 N.W.2d 753. When a valid sentence has been put into execution, the trial court cannot modify, amend, or revise it in any way, either during or after the term or session of court at which the sentence was imposed. *State v. Marrs, supra*; *State v. Tucker, supra*. When there is a conflict between the record of a judgment and the verbatim record of the proceedings in open court, the latter prevails. *State v. Tucker, supra; State v. Herngren,* 8 Neb. App. 207, 590 N.W.2d 871 (1999). Because the court orally pronounced valid sentences, the oral pronouncement controls; both of Miranda-Henriquez' convictions for first degree sexual assault of a child pursuant to § 28-319.01 carry 15-year mandatory minimum sentences, and we modify the court's written order to so reflect.

## VI. CONCLUSION

Having found the evidence sufficient to support Miranda-Henriquez' convictions, we affirm his convictions and sentences as modified to reflect that his sentences for his two convictions of first degree sexual assault of a child pursuant to § 28-319.01 each carry 15-year mandatory minimum sentences.

AFFIRMED AS MODIFIED.