STATE of Wisconsin, Plaintiff-Respondent,

v.

Dionny L. REYNOLDS, Defendant-Appellant.†

Court of Appeals

*No. 2009AP786–CR. Submitted on briefs February 2, 2010.
—Decided March 16, 2010.*

2010 WI App 56

(Also reported in 781 N.W.2d 739.)

On behalf of the defendant-appellant, the cause was submitted on the brief of *Russell D. Bohach*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Dionny L. Reynolds appeals from a judgment entered after a jury found him guilty of first-degree reckless homicide, while armed, as party to a crime, *see* Wis. Stat. §§ 940.02(1) and 939.05;[1] attempted armed robbery with use of force, as party to a crime, *see* Wis. Stat. §§ 943.32(1)(a) and (2), 939.32 and 939.05; and felony gun possession, *see* Wis. Stat. § 941.29(2) (2003–04).[2] Reynolds seeks a new trial on the grounds that the trial court erroneously allowed into evidence statements Reynolds made to Milwaukee police on November 9, 10, and 11, 2004. Reynolds asserts that the statements were involuntary and a product of coercive police conduct, in violation of his right to due process. We affirm.

### BACKGROUND

¶ 2. Milwaukee police arrested Reynolds in an unrelated matter on November 2, 2004, several days before he made the incriminating statements he seeks to suppress. Because he argues that the cumulative

---

[1] The judgment of conviction erroneously states that Reynolds was convicted of first-degree intentional homicide as opposed to first-degree reckless homicide. The clerk of courts is directed to amend the judgment of conviction accordingly.

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

effect of his multiple interviews with police beginning on November 2, 2004, created the coercive atmosphere that makes his later statements involuntary, we set forth the facts of all the interviews in their entirety. The facts are those gleaned from the trial and motion hearing, and to the extent the parties may disagree, we have so noted.

¶ 3. On the night of October 28, 2004, Special Agent John Balchunas of the Division of Criminal Investigation at the Wisconsin Department of Justice was partnered with Milwaukee Police Detective Carlo Davila to conduct surveillance in a designated area of Milwaukee. Before meeting up with Detective Davila, Agent Balchunas drove his unmarked car to a gas station at North 37th and West Villard Avenue in Milwaukee and bought a cup of coffee.

¶ 4. Shortly after midnight on the morning of October 29, 2004, Agent Balchunas radioed Detective Davila to report that he had been shot. Detective Davila radioed Milwaukee police for help. Milwaukee Police Officer Christopher Shorts arrived to find Agent Balchunas on his hands and knees by the rear of the car in the gas station lot, with the driver's door open. Agent Balchunas was dressed in plain clothes, with a badge on his belt, and his firearm still holstered at his hip. According to Officer Shorts, Agent Balchunas was in pain and reported that he had been shot in the stomach by "two younger black males wearing all dark clothing" who had accosted the agent "from the rear of the gas station." Agent Balchunas reported that he thought the suspects "fled southbound on foot on 37th Street." Agent Balchunas died as a result of the gunshot wound at the hospital on November 5, 2004.

¶ 5. After 4:00 p.m. on November 2, 2004, four days after the shooting of Agent Balchunas, Wauwatosa

389

police stopped a car driven by Reynolds and arrested Reynolds, Marques Walls, and Reginal Hart for robbing a Dairy Queen restaurant. Reynolds was transferred to the custody of the Milwaukee Police Department for questioning regarding the armed robbery of several Dairy Queen and Burger King restaurants.

¶ 6. Milwaukee Police Detective Mark Levenhagen first interviewed Reynolds at 10:45 a.m. on November 3, 2005—approximately eighteen hours after Reynolds' arrest for the Dairy Queen robbery. In the interim, Reynolds had been held either in the "bullpen" at the police station, where he would have been among other inmates, or in a private holding cell, which contained a cot, a toilet, and a sink. The interview concluded two and one-half hours later, at 1:20 p.m.

¶ 7. Detective Levenhagen said that at the outset of the interview, Reynolds was advised of his *Miranda*[3] rights, indicated he understood them, and executed a signed waiver of them. The detective said Reynolds appeared coherent and was responsive to questions— which dealt exclusively with the Dairy Queen and Burger King robberies. Reynolds was given a soda, cigarettes, and a bathroom break and never asked for counsel or to stop the interview. The detective said he made no threats or promises to Reynolds during an "easy going" interview.

¶ 8. On November 4, 2004, thirteen hours after the first robbery interview ended, Milwaukee Police Detective Patrice Bayer interviewed Reynolds again about the Dairy Queen robberies, from 2:30 a.m. to 7:15 a.m. Detective Bayer said that at the outset of the

---

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

interview, Reynolds was advised of his *Miranda* rights, indicated he understood them, and executed a signed waiver of them.

¶ 9. According to Detective Bayer, Reynolds "said he was fine to talk to me[,] . . . [and] not tired." The detective said Reynolds appeared coherent and was responsive to questions. At that time, Reynolds told the detective that he "takes Zantac" and experiences "panic attacks," but has no other medical problems. The detective said Reynolds exhibited no signs of a panic attack during the interview. The detective testified that Reynolds described himself as a frequent marijuana smoker, but said he had not smoked marijuana in five days.

¶ 10. Detective Bayer said that during the course of the second robbery interview Reynolds was given three cigarettes, a soda, and a cup of coffee and that Reynolds never asked for counsel or to stop the interview. The detective said Reynolds took three "rest breaks" of ten to fifteen minutes each and that no promises or threats were made to Reynolds during the interview which the detective described as "pleasant" in tone. After the interview, Reynolds was returned to either a holding cell or the bullpen.

¶ 11. At 11:25 a.m. on November 4, 2004, four hours after Detective Bayer interviewed Reynolds, Detective Levenhagen initiated a third robbery-related interview with Reynolds. This interview concluded at 4:10 p.m. Detective Levenhagen testified that at the outset of the interview, Reynolds again was advised of his *Miranda* rights, indicated that he understood them, and executed a signed waiver of them. The detective said Reynolds responded coherently and respectfully and never asked for counsel or to stop the interview. The detective said he made no promises or threats to

Reynolds. Detective Levenhagen said Reynolds was given cigarettes and a soda, and that near the end of the interview, Reynolds was permitted to make two phone calls—one to a " 'girlfriend' " and one to an " 'aunt.' "

¶ 12. Detective Levenhagen said that while he was on the elevator, taking Reynolds back to the city jail (one floor above the interview room), "Reynolds stated he had something important he wanted to tell me [about the robberies]." The detective said he and Reynolds returned to the interview room. Detective Levenhagen did not re-advise Reynolds of his *Miranda* rights, but did verify with Reynolds that Reynolds still understood his *Miranda* rights and was waiving them. This fourth interview began at 6:20 p.m. and ended at 7:35 p.m.

¶ 13. Following the fourth robbery-related interview, Reynolds remained in custody for a time at the city jail. At some point thereafter, Reynolds was transferred to the county jail at the sheriff's department, a location where inmates co-mingle and have access to cable television and reading materials.

¶ 14. Arnell Brown testified that in the late night hours of November 4, 2004 or early morning hours of November 5, 2004, he met Reynolds while in the bullpen at the Milwaukee Police Department. Brown had been arrested for possessing marijuana as a repeat offender, and Reynolds indicated that he was in custody for robbery. According to Brown, Reynolds confided that he and some friends had robbed Dairy Queen and Burger King restaurants. Brown also testified that Reynolds confided that he and a friend had decided to rob a patron outside a gas station on 37th Street, that a scuffle ensued, and that "they shot and then they took off running" down 37th Street. Brown said he was

aware from the news that a law enforcement officer had been shot at the gas station on 37th Street.

¶ 15. Brown was subsequently transferred to the county jail, where he met an inmate named Devery Evans, and told Evans that a fellow inmate at the city jail had admitted shooting the law enforcement officer outside the gas station on 37th Street. Brown said that Evans suggested that Brown write down the information and that Evans would pass it along to an officer whom Evans knew. Brown wrote out what he knew, adding more details at Evans' suggestion, and Evans gave the note to the officer.

¶ 16. On the night of November 8, 2004, Milwaukee Police Detective Charles Libal interviewed Brown about the note. From a six-photo array, Brown identified Reynolds as the inmate who admitted to the gas station shooting.

¶ 17. After Detective Libal finished speaking to Brown on November 8, Reynolds was brought from the county jail to an interview room at the police station. From 10:42 p.m. that night until 5:27 a.m. the next morning, Detectives Libal and Willie Huerta interviewed Reynolds about the homicide of Agent Balchunas. Detective Huerta said that at the outset of the interview Reynolds was advised of his *Miranda* rights, indicated he understood them, and executed a signed waiver of them. The detective said that Reynolds appeared coherent and responsive throughout the interview and that Reynolds never asked for counsel or to stop the questioning.

¶ 18. Detective Huerta said he asked Reynolds about "past experiences, what he wants to do in the next five years, things of that nature[,] . . . about life." At one point during the interview with Reynolds, the detectives brought Brown into the interview room to con-

393

front Reynolds with the information about the homicide that Brown said Reynolds had disclosed. Detective Huerta said Reynolds denied telling Brown that he had shot Agent Balchunas and that Brown "must have misheard what [Reynolds] was saying."

¶ 19. Detective Huerta reported that Reynolds "was given six cigarettes, two sodas, two bathroom breaks, and a total of four breaks" of "approximately 15 minutes" each. The detective said no threats or promises were made to Reynolds, and that Reynolds was cooperative.

¶ 20. At 5:29 p.m. on November 9, 2004, twelve hours after the conclusion of the prior interview, the police again brought Reynolds to an interview room to allow Detectives Matthew Goldberg and Ralph Spano to conduct a second homicide-related interview. Detective Spano, whom Reynolds had never met before, entered the interview room at 7:00 p.m. and, according to Detective Spano's testimony, had the following exchange with Reynolds:

> I advised [Reynolds] who I was, and I asked him if he knew why he was here today. He said he wasn't sure. I explained to him that you're here today to be talked to by myself and another detective and that in a few minutes we are going to be coming in and asking you a few questions regarding the Balchunas homicide.
>
> I went on to tell him that I was aware he had been interviewed on the previous day by Detective[s] Huerta and Libal and that I was aware that he had denied any involvement in that offense.
>
> I explained to him that we would be talking about that offense in a few minutes. I asked him if he needed anything. He said he did not.
>
> I went on to tell him that prior to us coming in and

394

asking him questions I wanted him to think about two things, and I wanted him to think long and hard about them. I went on to tell him that I was aware that he had children of his own.

I asked him if one of your children, if your [six-year-old] were killed or murdered, would you want some answers as to what happened regarding that homicide, what happened regarding the death of your [six-year-old], what happened to the person who committed the crime against your [six-year-old].

I told him, I want you to think about that, and I want you to think about one other thing. I told him I want you to think about the family of Agent Balchunas. I want you to think how they might be feeling right now. They don't have any answers regarding the death of their son, and I want you to think long and hard about that.

¶ 21. The detective testified that he also told Reynolds that "I don't want you to say anything to me right now," but rather he asked Reynolds to just think about his words before the interview began. Detective Spano said he "wanted to get [Reynolds'] conscience going" and that he did not give the speech in a threatening way. Detective Spano testified that, following the speech, he observed Reynolds "place[] his hands on his head and start[] weeping a bit," and then he began "dry heaving." Detective Spano placed the wastebasket in front of Reynolds and asked him if he wanted something to drink. Reynolds did not answer. Detective Spano told Reynolds he would get him something to drink and be back in a few minutes. The entire exchange took approximately fifteen minutes. When he left the room, Detective Spano believed Reynolds was "fine" and "just upset."

¶ 22. After Detective Spano retrieved Detective Goldberg and got Reynolds a glass of water, both detec-

tives returned to the interview room. Detective Spano testified that when he returned to the room Reynolds appeared more composed; he was no longer dry heaving, although he was still "weeping a bit." The detectives did not get the sense that he was suffering from any medical problems. At 7:20 p.m., Detective Goldberg advised Reynolds of his *Miranda* rights; Reynolds indicated that he understood them, and executed a signed waiver of them.

¶ 23.   Detective Spano testified at trial that for the first twenty to thirty minutes of the interview following Detective Spano's speech, Reynolds denied involvement in the shooting. Thereafter, Reynolds admitted to being at the scene with Anthony Bolden, but denied being the shooter, before ultimately admitting that he shot Agent Balchunas.

¶ 24.   Detective Goldberg testified that during the interview Reynolds appeared coherent, not tired or hungry, and was responsive to questions. The detective said no promises or threats were made to Reynolds who was "cooperative" but "emotional."

¶ 25.   The interview lasted from 7:20 p.m. to 1:00 a.m., during which time Reynolds was given "one Cousins meatball sandwich, two McDonald's cheeseburgers, three Pepsi colas, ten cigarettes, three trips to the bathroom, [and] four fifteen minute breaks."

¶ 26.   A written statement was created based on the interview. The statement said Reynolds and Bolden had gone to the area of 37th Street and West Villard Avenue, planning to "rob a weed dealer." Reynolds said Bolden gave him a black, nine-millimeter semi-automatic handgun that had the word " 'Hi-Point' printed on the frame." Reynolds said they parked the car in an alley behind a pizza place. Reynolds was wearing a black-hooded jersey, dark blue jeans, and black tennis shoes. Bolden was similarly dressed in dark clothing.

¶ 27. Reynolds said he and Bolden monitored the gas station from a bank across the street, and when they saw "a white dude" in the gas station lot they decided to rob him. Reynolds said that when Bolden felt a gun on the robbery victim, Reynolds "panicked, crouched down and raised [his] gun at the white dude and fired once" from about six feet away. Reynolds said he and Bolden then fled to their car, where he gave the gun to Bolden.

¶ 28. Detective Goldberg said that, following the interview, Reynolds signed each page of a fifteen-page statement and initialed changes. The statement was later read to jurors at Reynolds' trial.

¶ 29. Detective Spano testified that after Reynolds admitted killing Agent Balchunas, Reynolds expressed concern "that police might try and kill him." In response, Detective Spano assured Reynolds that he "would take immediate steps to make him feel better." Detective Spano then relayed Reynolds' concerns to the deputy chief who made sure that Reynolds had a guard placed on him around the clock while in the city jail. Detective Spano said Reynolds thereafter remained in jail for further questioning the next day. He said he directed the jailers to ensure that Reynolds showered, had breakfast, and was able to brush his teeth.

¶ 30. At 11:30 a.m. on November 10, 2004, ten and one-half hours after the prior interview concluded, Detectives Spano and Goldberg again interviewed Reynolds. Reynolds reported that he had slept, showered, and eaten breakfast. According to Detective Spano, Reynolds again was advised of his *Miranda* rights, indicated that he understood them, and executed a signed waiver of them. The detective said Reynolds appeared coherent and was responsive to questions. The detective said no promises or threats were made to Reynolds.

¶ 31. Detective Spano testified that from 3:30 p.m. to 4:45 p.m. the detectives took Reynolds out on the street to look for the handgun that Reynolds said he had placed in a garbage bin after the shooting. Detective Spano said the detectives then picked up "a Speed Queen [barbecued pork] shoulder dinner" for Reynolds, amounting to a forty-five-minute break. The detective said that during the interview, Reynolds also had "three Pepsi's, 10 cigarettes, five restroom breaks, and four rest breaks," including the dinner.

¶ 32. At 6:00 p.m., Reynolds was shown the surveillance videotape from the gas station to identify Agent Balchunas as the shooting victim. The interview concluded at 10:00 p.m., and Reynolds signed each page of a statement summarizing the interview. This statement was also read to jurors at trial.

¶ 33. At 1:00 p.m. the next day, November 11, 2004, fifteen hours after the prior interview, Detective Spano interviewed Reynolds. The detective said Reynolds appeared coherent, was advised of his *Miranda* rights, indicated that he understood them, and executed a signed waiver of them. The detective said he made no promises or threats to Reynolds, other than that the detective would "tell the district attorney whether [Reynolds had been] cooperative or not." The detective said that during this interview, Reynolds "was given two sub sandwiches, three Pepsi's, four cigarettes, [and] . . . four breaks[,] including a thirty-minute lunch." Detective Spano said that Reynolds never asked for counsel or to stop the interview and that Reynolds signed each page of a seven-page statement. This third statement was also read to the jurors at trial.

¶ 34. Based on his statements to the police, Reynolds was charged with one count of first-degree inten-

tional homicide,[4] while armed, as party to a crime; one count of attempted armed robbery with use of force, as party to a crime; and one count of felony gun possession. Reynolds moved to suppress the statements he made to the police while in custody. On February 25, 2005, a *Miranda - Goodchild*[5] hearing was held on the motion. The trial court determined that Reynolds had been properly advised of his *Miranda* rights, that he understood his rights, and that his subsequent statements were voluntarily made. Consequently, Reynolds' motion to suppress the statements was denied.

¶ 35. The matter first proceeded to trial on July 18, 2005, concluding on July 26, 2005, but resulted in a mistrial. The case proceeded to a second jury trial on December 5, 2005, concluding on December 13, 2005. The written and signed statements from the November 9, 10, and 11, 2004 interviews were read to the jury. On December 13, 2005, the jury returned verdicts of guilty with respect to all three counts. Reynolds now appeals.

## DISCUSSION

¶ 36. Reynolds asserts that his November 9 confession was involuntary, and therefore a violation of his

[4] Although Reynolds was charged with first-degree intentional homicide, while armed, as party to a crime, the jury convicted him of the lesser-included offense of first-degree reckless homicide, while armed, as party to a crime.

[5] *See Miranda*, 384 U.S. 436; *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965). If the defendant moves to suppress his or her statements because of law enforcement's failure to timely warn of the risks and consequences of self-incrimination (*Miranda*), or the voluntariness of the statements (*Goodchild*), the trial court conducts an evidentiary (*Miranda-Goodchild*) hearing to determine the validity of the accused's statements and whether suppression is warranted.

right to due process, because the detectives' conduct was coercive. Specifically, he points to his numerous interviews with police (beginning on November 2), the length of those interviews, and Detective Spano's speech, balanced against Reynolds' personal characteristics—particularly his propensity for panic attacks, his physical reaction to Detective Spano's speech, and his six-year-old son. He further asserts that statements he made to police on November 10 and 11 are also involuntary because they are "not sufficiently attenuated from the improper police conduct so as to be admissible." *See State v. Mark*, 2008 WI App 44, ¶ 20, 308 Wis. 2d 191, 747 N.W.2d 727 ("When an individual has given an involuntary statement, a subsequent statement is also considered involuntary unless it can be 'separated from the circumstances surrounding' the earlier statement.") (citation omitted). We find the November 9 confession voluntary, and therefore, need not address the admissibility of the November 10 and 11 statements.

■

¶ 37.   When reviewing the circuit court's decision on motion to suppress, we will uphold the trial court's findings of fact unless they are clearly erroneous, and we review the application of constitutional principles to those facts *de novo. State v. Grady*, 2009 WI 47, ¶ 13, 317 Wis. 2d 344, 766 N.W.2d 729. Here, the parties do not contest the basic facts. Thus, the issue before us is whether the collective behavior of the police detectives who interviewed Reynolds between November 2 and November 9, 2004, led him to involuntarily confess to shooting Agent Balchunas. The State must show voluntariness by a preponderance of the evidence. *State v. Jerrell C.J.*, 2005 WI 105, ¶ 17, 283 Wis. 2d 145, 699 N.W.2d 110.

¶ 38. "There are 'two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.' "[6] *State v. Ward*, 2009 WI 60, ¶ 18, 318 Wis. 2d 301, 767 N.W.2d 236 (citation omitted).

> "A defendant's statements are voluntary if they are the product of free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist."

*State v. Davis*, 2008 WI 71, ¶ 36, 310 Wis. 2d 583, 751 N.W.2d 332 (citation omitted). In effect, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

¶ 39. To determine whether a confession was voluntary, that is "whether a confession was rationally and deliberately made" and was not unduly pressured by the State, we look to the totality of the circumstances surrounding the confession. *State v. Clappes*, 136 Wis. 2d 222, 236, 401 N.W.2d 759 (1987). We "balance the personal characteristics of the defendant against the pressures imposed upon him by police in order to induce him to respond to the questioning." *Id.* Relevant

---

[6] Our interpretation of the voluntary requirement is generally consistent with that of the United States Supreme Court. *State v. Ward*, 2009 WI 60, ¶ 18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236.

personal characteristics of a defendant include: "his age, his education and intelligence, his physical and emotional condition, and his prior experience with the police." *Id.* Relevant police pressures and tactics include: "length of the interrogation, any delay in arraignment, the general conditions under which the confessions took place, any excessive physical or psychological pressure . . ., any inducements, threats, methods or strategies utilized by the police to compel a response, and whether the individual was informed of his [*Miranda*] right[s]." *Clappes*, 136 Wis. 2d at 236–37.

¶ 40. Turning first to Reynolds' personal characteristics, we note that at the time of his arrest for the Dairy Queen robbery he was twenty-six years old, and he had a six-year-old son. He also had an extensive criminal history, including arrests and prior convictions for arson, possession with intent to deliver cocaine, carrying a concealed weapon, two batteries, and two acts of criminal damage to property. He had an eleventh-grade education and could read and write the English language. While Reynolds told police that he suffers from panic attacks and asthma, during his interviews with the detectives he appeared coherent, responsive to questions, and fully cognizant of the situation. He never complained of being tired or hungry. With the exception of when he began weeping and dry heaving following Detective Spano's speech, he exhibited no signs of panic attacks or asthma during the interviews.

¶ 41. Setting forth the detectives' conduct, we note that Reynolds was interviewed six times while in custody for unrelated robberies from November 2 through 9, 2004, before finally confessing to shooting Agent Balchunas on November 9. The first three robbery interviews were two and one-half hours, five

hours, and four and one-half hours in length respectively, and included numerous breaks for cigarettes, soda, coffee, and bathroom use. During the third robbery interview, Reynolds was permitted to make phone calls to an aunt and a girlfriend. The first three robbery interviews were spaced thirteen hours and four hours apart, and Reynolds initiated the fourth interview, which was only one and one-half hours in length.

¶ 42.   Almost four days went by after the fourth robbery interview before police officers brought Reynolds back in to discuss the shooting of Agent Balchunas. During those four days, Reynolds remained in custody on the robberies and was housed in the bullpen where he was able to co-mingle with fellow inmates (including Brown), watch television, and read books or newspapers.

¶ 43.   The two homicide interviews that led to the November 9 confession were six and one-half hours and six hours long respectively. Again, these times include numerous breaks for food, sodas, cigarettes, and bathroom use. The detectives also provided Reynolds with a significant twelve-hour break between the first two homicide interviews—during which time Reynolds was able to sleep and eat.

¶ 44.   Before each interview Reynolds was advised of his *Miranda* rights, indicated he understood them, and executed a signed waiver of them. The detectives did not threaten or make promises to Reynolds during any of the interviews—although Detective Spano did attempt to "get [Reynolds'] conscience going" when, during his fifteen-minute speech, he asked Reynolds to empathize with Agent Balchunas' family.

¶ 45.   Balancing Reynolds' personal characteristics against the totality of the police detectives' conduct,

403

we note, first and foremost, that Reynolds voluntarily waived his *Miranda* rights *before* making his incriminating statement. Generally speaking, "giving the warnings and getting a waiver has ... produced a virtual ticket of [a statement's] admissibility." *See Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004). While Reynolds argues that the *statement* itself was involuntary, he does not argue that the *waiver* was involuntary. Nor could he successfully make such an argument given his age, education, experience in the criminal justice system, and the fact that he had waived his rights on five previous occasions over the prior seven-day period. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). And there is nothing special about this case that transforms it into one of those rare cases.

¶ 46. Further, we conclude that while the detectives' conduct was persistent, it was not coercive. The robbery interviews were not unduly long—the longest being five hours in length—and the detectives remained aware of Reynolds' personal needs, ensuring that he was given appropriate breaks during and between interviews, food and drink, and even allowing him two personal phone calls. *See, e.g., Schilling v. State*, 86 Wis. 2d 69, 88–89, 271 N.W.2d 631 (1978) (noncontinuous, two-day interrogation lasting "a considerable number of hours" and including breaks for food and drink, not coercive). It appears the detectives were successful in their efforts to ensure Reynolds' comfort because he appeared alert and aware throughout the interviews.

404

¶ 47.  Almost four days passed after the final robbery interview before the detectives brought Reynolds back into the interview room to discuss the shooting of Agent Balchunas. During that time, Reynolds was housed in the county jail where he was able to co-mingle with other inmates, watch cable television, and read. Those four days provided Reynolds plenty of time to decompress from the robbery interviews before being interviewed in relation to the shooting of Agent Balchunas.

¶ 48.  Additionally, the two homicide interviews which led up to Reynolds' confession were not unduly burdensome. The interviews were only six hours and six and one-half hours long respectively, but Reynolds confessed relatively early on during the second interview. *See id.* Again, the detectives ensured that Reynolds was comfortable, providing him with food, drink, cigarettes, and breaks when needed.

¶ 49.  The main thrust of Reynolds' argument of undue pressure is based on Detective Spano's speech. Reynolds, relying on *Rhode Island v. Innis*, 446 U.S. 291 (1980), argues that Detective Spano's speech, in combination with the number and length of the previous interviews, was coercive because Detective Spano knew or should have known that the speech was "reasonably likely to elicit an incriminating response." *See id.* at 301. *Innis*, however, does not support Reynolds' argument. In *Innis*, the Court held that " 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. However, the Court did so while addressing whether police officers violated Innis' *Miranda* rights

405

by interrogating him *after he had expressly exercised his right to counsel. Innis,* 446 U.S. at 293. Because Reynolds did not expressly exercise his right to counsel, but rather expressly waived all his *Miranda* rights before confessing, we need not determine whether Detective Spano's speech was an interrogation.

¶ 50.   Detective Spano merely made an appeal to Reynolds' conscience and in doing so was not overly manipulative—especially in light of other interview practices which have withstood attacks on the voluntariness of confessions. *See, e.g., State v. Michels,* 141 Wis. 2d 81, 91–92, 414 N.W.2d 311 (Ct. App. 1987) (showing autopsy photo of foster son's fractured skull to illiterate suspect who had spent three years in a Yugoslavian concentration camp, not coercive); *Barrera v. State,* 99 Wis. 2d 269, 293, 298 N.W.2d 820 (1980) (discussing religious convictions with suspect and telling him that "he would have to face up to it when he met his maker," not coercive). Detective Spano explicitly told Reynolds he did not want Reynolds "to say anything to me now." When Reynolds became emotional in response to Detective Spano's speech, Detective Spano did not ask Reynolds questions or otherwise manipulate his vulnerable state. Instead, Detective Spano attempted to make Reynolds comfortable by offering him water and providing him with a wastebasket. He then gave Reynolds time to compose himself before returning to the interview room with a glass of water, advising Reynolds of his *Miranda* rights, and beginning the interview. Notably, Reynolds did not immediately confess to shooting Agent Balchunas, but instead initially denied being involved. The immediate denial belies Reynolds' argument that Detective Spano's speech overcame his will.

¶ 51.   Reynolds did not make an incriminating statement until *after* being informed of and waiving his

406

*Miranda* rights. This is not an instance where a defendant chose to exercise a right and was then approached by officers for questioning. Reynolds—an adult with an extensive criminal background, who was literate in the English language, and who had been advised of his rights on at least five different occasion in the seven days leading up to his confession—indicated he understood his *Miranda* rights and waived those rights before confessing to shooting Agent Balchunas. When we view that fact in combination with Reynolds' other personal characteristics and the totality of the detectives' behavior leading up to his confession, we conclude that his confession was voluntary and not the result of coercive police conduct.

¶ 52. Because we conclude that Reynolds' November 9 confession was voluntary, we need not consider whether his subsequent confessions on November 10 and 11 were sufficiently attenuated from the November 9 statement.

*By the Court.*—Judgment affirmed.