**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 21, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP84-CR**

STATE OF WISCONSIN

Cir. Ct. No.  **2021CF56**

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

 V.

NAJEE S. HUDSON,

   DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for La Crosse County: RAMONA A. GONZALEZ, Judge. *Affirmed*.

Before Graham, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1   PER CURIAM.   Najee S. Hudson moved to exclude as evidence all oral and written statements he made to law enforcement during a custodial

interrogation, asserting that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights and that his statements to the police were involuntary.[1] The circuit court granted Hudson's motion, reasoning, among other things, that his waiver of his *Miranda* rights was involuntary and unknowing. The State appeals. We affirm on the grounds that the State has not met its burden of showing by a preponderance of the evidence that Hudson's *Miranda* waiver was knowing and intelligent.

## BACKGROUND

¶2      Police obtained and executed a search warrant for Hudson's residence seeking evidence of an alleged sexual assault. The police transported Hudson to the La Crosse Police Department, where he was questioned about the alleged assault by then-Investigator Pataska. Pataska's body camera recorded the entirety of the custodial interrogation, which lasted just over one hour.

¶3      At the beginning of the interrogation, Hudson expressed confusion about the basis for the search of his house and his detention, and Pataska informed him that he had been arrested. Pataska initially declined to provide any additional information to Hudson about the basis for his arrest until she read Hudson his *Miranda* rights, and she presented Hudson with a form with lines for his signature. The first section of the form, titled "Your Rights," is a statement of the signatory's *Miranda* rights. The second section of the form, titled "Waiver of Rights,"

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

contains statements about the consequence of a waiver, including: "I am willing to make a statement and answer questions. I do not want a lawyer at this time."[2]

¶4 After presenting the form to Hudson, Pataska read aloud the "Your Rights" section of the form. Hudson appeared confused and asked several

---

[2] The contents of the form are as follows:

Your Rights

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can and will be used against you in a court of law.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him/her with you during questioning.

If you are unable to hire a lawyer, you can request and receive appointment of a lawyer by the proper authority, without costs or charge to you, to be present and advise you before and during this statement.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time, you also have the right to stop answering at any time until you talk to a lawyer.

Signed _____

Waiver of Rights

I have read this statement of rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing, no promises or threats have been made to me and no pressure or coercion of any kind have been used against me.

Signed _____

questions to Pataska regarding the consequences of waiving his *Miranda* rights, including about any delay that would be caused if he requested counsel during his interrogation. When Pataska told him that he would be "sitting in the jail" waiting for an attorney, Hudson expressed concerns about being delayed returning home, where he was needed to assist his mother and wheelchair-confined uncle.

¶5      Pataska also responded to Hudson's questions about the consequences of waiving his rights by reading out loud the "Waiver of Rights" section of the form and by twice telling Hudson that, "when you sign [the form], you are saying you want to talk to me." Pataska eventually told Hudson that she was investigating a sexual assault, about which Hudson expressed a desire to talk. He then signed both the "Your Rights" and "Waiver of Rights" sections of the form and provided statements to Pataska that he subsequently moved to suppress. The portion of the interrogation leading up to Hudson's waiver is described in more detail in the discussion below.

¶6      Hudson was charged with several offenses related to sexual assault and bail jumping. Hudson moved to exclude as evidence all statements made during his custodial interrogation on two separate bases: (1) that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights; and (2) that his statements were involuntary and that their use at trial would violate the Fourteenth Amendment's due process protections.

¶7      The circuit court held a *Miranda-Goodchild* hearing and granted Hudson's motion to exclude the statements before the prosecution was able to

4

present all of its evidence.[3] The court reasoned that, because Hudson did not have information about how long it would take to obtain an attorney, his **Miranda** waiver was not "knowing and voluntary." When trial counsel asked to clarify its ruling, the court responded that it was granting the motion on "[v]oluntariness grounds" and explained, "I don't believe that it was knowing and voluntarily made when he was denied the opportunity to know how long that lawyer would take to get there."

¶8 The State appealed, and this court reversed the circuit court's decision. We concluded that, whether the circuit court suppressed Hudson's statements because his **Miranda** waiver was invalid, because his statements were not voluntary, or both, the court applied an incorrect legal standard and failed to consider the totality of circumstances which were not fully developed at the truncated hearing. **State v. Hudson**, No. 2022AP191-CR, unpublished slip. op. ¶¶25-26, 34 (WI App Sep. 9, 2022). This court remanded for a "full and fair **Miranda-Goodchild** hearing." **Id.**, ¶34. This court did not determine whether Hudson's **Miranda** waiver was valid or whether his statements were voluntary. **Id.**

¶9 On remand, the circuit court held a second **Miranda-Goodchild** hearing during which the prosecution played a portion of Pataska's body camera video of Hudson's interrogation and presented testimony from Pataska. After hearing arguments from both parties, the court again excluded Hudson's

---

[3] Named after **Miranda**, 384 U.S. 436, and **State ex rel. Goodchild v. Burke**, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), such evidentiary hearings are designed to determine the adequacy of **Miranda** warnings, whether the defendant validly waived their constitutional rights, and whether the ensuing statements were voluntarily made. **State v. Jiles**, 2003 WI 66, ¶25, 262 Wis. 2d 457, 663 N.W.2d 798.

statements from the interrogation. The court explained that "[Hudson's] waiver was not voluntary and knowingly made" because Pataska "[led] him to believe" that he would get to go home if he talked to her. The court further explained that Hudson was "made to believe" that, if he invoked his right to counsel rather than speak with Pataska without counsel, he would be taken to jail.[4] The State appeals.

## DISCUSSION

¶10 On appeal, the State argues that the circuit court erroneously excluded Hudson's statements because he voluntarily, knowingly, and intelligently waived his *Miranda* rights and because his statements were voluntary. For the reasons set forth below, we conclude that the court properly suppressed Hudson's statements because the State did not meet its burden of showing by a preponderance of the evidence that Hudson's waiver was knowing and intelligent. Accordingly, we do not address whether Hudson's *Miranda* waiver or his statements were voluntary. *Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").[5]

---

[4] We note that the prosecution asked the circuit court to clarify whether its decision was based on voluntariness, and the court responded, "I do believe that he was not voluntary." The court did not clearly explain whether its decision regarding voluntariness was based on the voluntariness of Hudson's *Miranda* waiver, his subsequent statements, or both. The court's written order—which stated that it granted Hudson's motion "for the reasons stated on the record"—also did not clarify this issue. In any event, we need not determine the precise grounds for the court's involuntariness decision because, as discussed below, we affirm the court's decision that Hudson's *Miranda* waiver was not knowing and intelligent.

[5] The parties do not dispute that Pataska's questioning of Hudson was a "custodial interrogation" as is necessary to trigger *Miranda* protections. *See State v. Dobbs*, 2020 WI 64, ¶52, 392 Wis. 2d 505, 945 N.W.2d 609. The parties also do not dispute that Hudson did not invoke his right to a lawyer such that Pataska would have been required to cease questioning. *See State v. Jennings*, 2002 WI 44, ¶26, 252 Wis. 2d 228, 647 N.W.2d 142 ("[T]he police must

(continued)

## I. Legal Principles and Standard of Review.

¶11    We review motions to exclude evidence on constitutional grounds using a two-part analysis. *State v. Lemoine*, 2013 WI 5, ¶15, 345 Wis. 2d 171, 827 N.W.2d 589. We review the circuit court's findings of historical fact, which we uphold unless they are clearly erroneous, and the application of constitutional principles to those historical facts de novo. *Id.* (citation omitted).

¶12    The Fifth Amendment to the United States Constitution, as well as Article I, Section 8 of the Wisconsin Constitution, set forth a privilege to remain silent in the face of government accusation, which is often referred to as the privilege against self-incrimination. *State v. Rejholec*, 2021 WI App 45, ¶18, 398 Wis. 2d 729, 963 N.W.2d 121. This privilege is applicable during the entire period of a custodial interrogation. *Id.*

¶13    In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court formulated procedures to secure the privilege against self-incrimination. *Colorado v. Spring*, 479 U.S. 564, 572 (1987). Under *Miranda*, the State "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *State v. Dobbs*, 2020 WI 64, ¶52, 392 Wis. 2d 505, 945 N.W.2d 609 (quoting *Miranda*, 384 U.S. at 444). One of these procedural safeguards is that the defendant must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the

---

immediately cease questioning a suspect who clearly invokes the *Miranda* right to counsel at any point during custodial interrogation.").

7

presence of an attorney, either retained or appointed." *Id.* (quoting *Miranda*, 384 U.S. at 444). These rights are often referred to as a suspect's "*Miranda* rights." *Rejholec*, 398 Wis. 2d 729, ¶19.

¶14 In order to admit a defendant's custodial statements into evidence, the State must prove by a preponderance of the evidence that the defendant was adequately informed of and validly waived their *Miranda* rights. *Id.*, ¶19 & n.7. A defendant's waiver of their *Miranda* rights is valid if their waiver was voluntary, knowing, and intelligent. *Id.*[6]

¶15 We employ a multi-step process in our analysis of whether a defendant knowingly and intelligently waived their *Miranda* rights. *State v. Mitchell*, 167 Wis. 2d 672, 696, 482 N.W.2d 364 (1992). First, we determine whether the State has met its prima facie burden under *Miranda*. *Id.* "[T]he general rule is that a prima facie case will be established 'when the state has established that defendant has been told or has read all the rights and admonitions required in *Miranda*, and the defendant indicates he [or she] understands them and is willing to make a statement.'" *Id.* at 697 (citation omitted). We evaluate whether the State has made a prima facie showing by the preponderance of the evidence. *State v. Cole*, 2008 WI App 178, ¶35, 315 Wis. 2d 75, 762 N.W.2d 711

---

[6] We observe that, under the "impeachment exception," "[a] finding that statements were obtained in violation of *Miranda* does not inexorably lead to a finding of involuntariness with the attendant prohibition against impeachment use of the statements." *State v. Rejholec*, 2021 WI App 45, ¶27 n.10, 398 Wis. 2d 729, 963 N.W.2d 121 (quoting *State v. Mendoza*, 96 Wis. 2d 106, 118, 291 N.W.2d 478 (1980)). "A statement of the defendant made without the appropriate *Miranda* warnings, although inadmissible in the prosecution's case-in-chief, may be used to impeach the defendant's credibility if the defendant testifies to matters contrary to what is in the excluded statement." *Id.* (quoting *Mendoza*, 96 Wis. 2d at 118). "It is only if the statements are also found to be involuntary that their use for impeachment purposes is precluded." *Id.* (quoting *Mendoza*, 96 Wis. 2d at 118-19).

("[I]t is the State's burden to prove by a preponderance of the evidence that the defendant validly waived his *Miranda* rights ….  The State accomplishes this by, first, producing evidence to establish a prima facie case." (citations omitted)).

¶16    Second, if the State has made a prima facie showing of a knowing and intelligent *Miranda* waiver, the burden shifts to the defendant to provide "countervailing evidence" that their *Miranda* waiver was not knowing and intelligent.  *State v. Lee*, 175 Wis. 2d 348, 361, 499 N.W.2d 250 (Ct. App. 1993).  Considering the totality of circumstances, the court must then determine whether the state has met its burden of proof by a preponderance of the evidence that the defendant's waiver was knowing and intelligent.  *Id.* at 361, 364.  In doing so, the court employs an "objective" standard where it inspects "the particular circumstances involved, including the education, experience and conduct of the accused as well as the credibility of the police officers' testimony." *Id.* at 364.

## II.  Knowing and Intelligent Waiver.

¶17    A defendant understands their *Miranda* rights and knowingly and intelligently waives those rights if the defendant has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Santiago*, 206 Wis. 2d 3, 18-19, 556 N.W.2d 687 (1996) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  This requires the defendant to understand that they "may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Spring*, 479 U.S. at 574.  Separately, it also requires the defendant to understand "the critical advice that whatever [the defendant] chooses to say may be used as evidence against [them]." *Id.*  In other words, the State must show that the defendant "knew [they] could stand mute and request a lawyer, and that [they

were] aware of the State's intention to use [their] statements to secure a conviction[.]" **Burbine**, 475 U.S. at 422. A knowing and intelligent waiver does not require the defendant to be aware of every possible consequence of waiving their **Miranda** rights, nor must the defendant be aware of "all information that might be 'useful'" or "that might 'affect [their] decision to confess.'" **Lee**, 175 Wis. 2d at 364-65 (citation omitted).

¶18 In determining whether a defendant's waiver was knowing and intelligent, our focus is on the defendant's state of mind, not the state of mind of the police. **Burbine**, 475 U.S. at 423 ("[T]he state of mind of the police is irrelevant to the question of the intelligence … of [the defendant's] election to abandon [their] rights."). As a result, the withholding of information by the police, even if "objectionable as a matter of ethics," will not render the defendant's waiver constitutionally invalid unless it "deprives [the] defendant of knowledge essential to [their] ability to understand the nature of [their] rights and the consequences of abandoning them." **Id.** at 423-24.

¶19 In the present case, there is no dispute that Pataska properly read the **Miranda** warnings at the start of the interrogation and that Hudson ultimately signed an acknowledgment of his rights and a waiver. Even so, both parties expressly agree that "just because [Hudson] was read the [**Miranda**] rights, does not mean he understood them." Accordingly, in determining whether the State has met its prima facie burden to establish a knowing and intelligent waiver, we must determine whether the State has established that the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." **Santiago**, 206 Wis. 2d at 18-19.

¶20     The State argues that Pataska's testimony, the video evidence, and Hudson's prior experience with police all support its position that Hudson was aware of what he was doing and knowingly waived his rights.  Hudson argues that he did not understand that, by waiving his rights and speaking to Pataska, the State could use his statements against him to secure a criminal conviction.

¶21     For the following reasons, we conclude that the State did not establish by a preponderance of the evidence a prima facie case that Hudson understood this consequence of waiving his rights.[7]   Although the discussion began with Pataska properly reading Hudson his *Miranda* rights and concluded with Hudson signing both sections of the form, the balance of the discussion consisted of Hudson's expressions of confusion about the consequences of waiver and Pataska's explanations that omitted "the critical advice that whatever [Hudson] chooses to say may be used as evidence against him." *See Spring*, 479 U.S. at 574.

¶22     As detailed in the transcript of the interview, Pataska began her questioning of Hudson by reading the required *Miranda* warnings, including the warning that "[a]nything you say can and will be used against you in a Court of Law."  After a discussion of whether Hudson would be able to go home after his interrogation, the following exchange between Pataska and Hudson occurred:

---

[7] Because the State failed to establish a prima facie case that Hudson knowingly and intelligently waived his *Miranda* rights, our analysis stops there and we need not consider whether Hudson has shown by "countervailing evidence" that he did not knowingly and intelligently waive his *Miranda* rights. *State v. Lee*, 175 Wis. 2d 348, 360-61, 499 N.W.2d 250 (Ct. App. 1993) (when the State has made a prima facie showing that a defendant's *Miranda* waiver was knowing and intelligent, the defendant's statements should be admitted unless "countervailing evidence" shows that the defendant did not knowingly and intelligently waive their *Miranda* rights).

NAJEE HUDSON:  I just want -- I want someone to know what's going on right now.  I mean I also would like, seriously like to understand more of what this is all about.

OFFICER:  Sure.  And I'd like to get into that.  But if you understand your rights and you still wish to talk to me, then --

NAJEE HUDSON:  I just don't.

OFFICER:  -- I need you to sign.

NAJEE HUDSON:  *I don't want to sign my rights over.*

OFFICER:  Okay.

NAJEE HUDSON:  But then like --

OFFICER:  Well, then I can't talk to you.  That's the law.

NAJEE HUDSON:  That's what my question was.

OFFICER:  Okay.

NAJEE HUDSON:  *If I sign, is that me signing my rights over?*

OFFICER:  Well, what this is saying, is that you want to talk to me.  *So when you sign this, you are saying you want to talk to me.*

Obviously you can read it again if you wish.  And then from there, obviously I read down to the second part too, which you can --

NAJEE HUDSON:  That's the part, it's a Waiver of Rights.

OFFICER:  Correct, yup.

NAJEE HUDSON:  *If I'm waiving my rights, is that meaning me not being able to use them, or like what is that saying?*

OFFICER:  The Waiver of Rights is just saying -- well, okay.  So I know you didn't sign the [acknowledgment of rights].  I will read the second part, and then you can, I guess decide from there maybe.  So I will just read this out loud as well.

"I've read this Statement of Rights, and I understand what my rights are.  I am willing to make a statement and answer

12

questions. I do not want a lawyer at this time, and I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

*So you're right, these are your rights portion that you would be signing, saying you understand your rights. And then this is the Waiver of Rights.*

*By signing, you're saying, yup, I am willing to talk to you and answer questions or talk about this.*

So that's what these are about.

NAJEE HUDSON: Well, we have to talk. Because if we don't talk, then that makes, you know what I'm saying, (inaudible) why I was even brought here.

OFFICER: Okay.

NAJEE HUDSON: So.

OFFICER: And you can stop talking at any time, that's obviously part of the rights.

[Hudson moves form over and looks at it].

NAJEE HUDSON: I understand that. But you also just mentioned a part of the same sentence, that if I don't talk or say anything right now, I want my lawyer present, that I am going to go to jail.

OFFICER: Well --

NAJEE HUDSON: I can't, I'm not trying to go to jail.

OFFICER: I understand that.

NAJEE HUDSON: I want to finish this right here, this questioning. You take whatever statements you need and like I need to be home --

OFFICER: Sure.

NAJEE HUDSON: -- today.

OFFICER: I hear you.

….

13

NAJEE HUDSON: I should be leaving. I know you leave at 4:00, I should be already home or I'm --

OFFICER: And that's why I want to figure out what happened. I want to figure out what's going on. That's my job.

[Hudson picks up pen while looking at form]

NAJEE HUDSON: I want to talk, I want to talk about this. I do have a lawyer. But like he will be contacted I understand.

[Hudson, with pen in hand, starts to sign the form and hesitates.]

NAJEE HUDSON: This is -- *I really feel like this means something else right now that this is [inaudible] like me signing my fucking rights over.*[8]

OFFICER: All right. Well, I told you that what I want to talk to you about is a sexual assault.

NAJEE HUDSON: Okay.

OFFICER: That happened in August, 2020, so just this past August. So that's what I'm investigating and looking into.

NAJEE HUDSON: (Inaudible.)

---

[8] The transcript of the interrogation states that Hudson said, "I really feel like this means something else right now. Like this is not necessarily in my [inaudible]." In the previous appeal in this matter, we noted that we heard Hudson say something slightly different in the video recording: "I really feel like this means something else right now that this is [inaudible] like me signing my fucking rights over." *State v. Hudson*, No. 2022AP191-CR, unpublished slip. op, ¶8 n.3 (WI App Sep. 9, 2022). Nonetheless, we declined to resolve the precise wording and explained that, under either version, "Hudson was expressing confusion over the meaning of the waiver of rights form." *Id.*

On appeal, the State does not dispute our interpretation of Hudson's statement in the previous appeal. However, Hudson argues on appeal that he was actually saying: "I really feel like this means something else right now. This, like, this is not me signing my motherfucking rights or whatever." Given that there is nothing in the record to contradict this court's interpretation from the prior appeal, we see no reason to depart from that interpretation now. We also reiterate that, regardless of Hudson's exact words, "Hudson was expressing confusion over the meaning of the waiver of rights form." *Id.*

14

OFFICER: So that's the case, that's what it's all about.

NAJEE HUDSON: I've had multiple girlfriends, and I've never done anything like that. And we can continue as time continues on, a hundred percent. I would love to clear the air on all of this.

OFFICER: Okay.

[Hudson signs the form in two places.]

(Emphasis and bracketed annotations added.)

¶23 Although Hudson's statements in the excerpted portion above indicate that he understood that he had the right to have a lawyer with him during his interrogation and that his signing of the waiver section of the form allowed him to speak with Pataska (which Pataska twice stated), there are no similar statements by Hudson that indicate he understood that his statements could be used against him to secure a criminal conviction. *See* ***Burbine***, 475 U.S. at 422 (a knowing and intelligent waiver requires the defendant to be "aware of the State's intention to use his statements to secure a conviction").

¶24 As the transcript shows, after Pataska read the required ***Miranda*** warnings, Hudson asked: "If I sign, is that me signing my rights over?" We interpret this statement as Hudson expressing that he did not understand the consequences of signing the waiver section of the form. In response, Pataska told Hudson that signing the waiver section of the form meant that he was willing to talk to her: "Well, what this is saying, is that you want to talk to me. So when you sign this, you are saying you want to talk to me." This response by Pataska was accurate to the extent that it explained that Hudson, by signing the waiver section of the form, would be agreeing to talk with her. However, this response was incomplete because it did not convey that another consequence of signing the form and agreeing to talk was that the State could use Hudson's statements against

15

him to secure a conviction. As a result, we are not satisfied that Pataska's initial response to Hudson's question sufficiently rectified his expressed lack of understanding about the consequences of his *Miranda* waiver.

¶25 After Pataska's response, Hudson again asked about the consequences of waiver: "If I'm waiving my rights, is that meaning me not being able to use them, or like what is that saying?" In response, Pataska read aloud the section of the form titled "Waiver of Rights." This section of the form described some of the consequences of a waiver, including the following: "I am willing to make a statement and answer questions. I do not want a lawyer at this time[.]" This section also included an acknowledgement that the signatory understands the rights: "I have read this Statement of Rights and I understand what my rights are.… I understand and know what I am doing." However, this section of the form did not include the consequence that Hudson's statements could be used against him to secure a conviction. After reading the "Waiver of Rights" section of the form, Pataska then summarized that signing the waiver section of the form is "saying that you understand your rights" and "saying, yup, I am willing to talk to you and answer questions or talk about this."

¶26 Like Pataska's response to Hudson's initial question, Pataska's response to Hudson's second question was accurate, but incomplete. To be sure, the "Waiver of Rights" section of the form that Pataska read aloud accurately conveyed that, by signing the waiver section, Hudson would be agreeing to talk to Pataska without his lawyer. Hudson's statements throughout this portion of his interrogation indicate that he understood that consequence of his "Waiver of Rights." And Pataska's summary of the "Your Rights" section of the form accurately conveyed that Hudson would be agreeing that he understands all of the rights listed in that section. But Pataska's explanation of the consequences of

waiving these rights, which she explained as Hudson being willing to talk to her and answer questions, does not satisfy us that Hudson comprehended that his statements could be used against him to secure a conviction. Hudson expressly told Pataska that he did not understand the meaning of signing the waiver section of the form, yet Pataska's response—whether intentionally or not—minimized the consequences by omitting the "critical" information that one consequence of signing the waiver section of the form and talking to Pataska was that his statements could be used against him to criminally convict him. *See Spring*, 479 U.S. at 574. The combination of Hudson's express statements that he did not understand the meaning of signing the waiver section of the form and Pataska's incomplete responses do not establish that Hudson was "aware of the State's intention to use his statements to secure a conviction." *See Burbine*, 475 U.S. at 422.

¶27 At this point, Hudson again expressed that he did not understand the meaning of signing the waiver section of the form: "I really feel like this means something else right now that this is [inaudible] like me signing my fucking rights over." This time, however, Pataska did not attempt to explain the meaning of the waiver form to Hudson. Instead, Pataska responded that she was investigating a sexual assault from August 2020, to which Hudson replied, "I would love to clear the air on all of this" and signed both sections of the form.

¶28 This final portion of the exchange shows that Pataska's earlier responses had not eliminated Hudson's confusion about the consequences of waiving his rights and that he was still unsure about the rights that he was "signing … over." This is also evident from the body camera video, which shows Hudson picking up the pen, putting the pen on a signature line, sighing deeply, and saying, while gesturing to the form, "I really feel like this means something else right now

17

that this is [inaudible] like me signing my fucking rights over." We are not confident that Hudson signed the waiver section of the form with the awareness that his statements could be used against him to secure a conviction.

¶29 We acknowledge that, under our case law, a defendant's "express written or oral statement of waiver" is "usually strong proof of the validity of that waiver." *State v. Ward*, 2009 WI 60, ¶30, 318 Wis. 2d 301, 767 N.W.2d 236 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). However, an express written or oral statement of waiver is neither "necessary nor sufficient to establish waiver." *Butler*, 441 U.S. at 373. Under the specific circumstances in this case, we do not agree that Hudson signing the form is "strong proof" that Hudson's waiver was knowing and intelligent. As discussed above, Hudson had repeatedly expressed that he did not understand the consequences of waiving his rights, including while he was holding the pen and appearing to contemplate whether to sign the form. Pataska's answers to Hudson's questions, although not inaccurate, omitted the important information that Hudson's statements could be used against him. As a result, we do not agree that Hudson's ultimate act of signing the waiver section of the form is stronger proof of his understanding than his nearly simultaneous verbal statement that he continued to not understand the consequences of waiver.

¶30 The circumstances of this case are distinguishable from other cases where the State has satisfied by a preponderance of evidence its prima facie burden of showing a valid *Miranda* waiver. In none of those cases did the defendant express that they lacked an understanding of the *Miranda* warnings or the consequences of waiver. *See, e.g.*, *Ward*, 318 Wis. 2d 301, ¶31 (Ward was given the *Miranda* warnings, acknowledged that she understood each of those warnings, and recited those warnings back to the officer unprompted); *Mitchell*,

167 Wis. 2d at 679-80, 697 (Mitchell was twice warned of his *Miranda* rights and he indicated both verbally and in writing that he understood those rights); *Schilling v. State*, 86 Wis. 2d 69, 77, 87, 271 N.W.2d 631 (1978) ("[Schilling] was repeatedly advised of his right to counsel, his right to counsel during questioning, his right to remain silent, and that what he said could be used against him in court" and "at all times … stated he understood his rights"); *State v. Reynolds*, 2010 WI App 56, ¶51, 324 Wis. 2d 385, 781 N.W.2d 739 (Reynolds was given *Miranda* warnings before interrogation, had been given those warnings five other times in the preceding week, and indicated that he understood his rights); *State v. Young*, 2009 WI App 22, ¶¶7-10, 21, 316 Wis. 2d 114, 762 N.W.2d 736 (2008) (Young was given *Miranda* warnings on three occasions, acknowledged that he understood those warnings, and later testified that he understood his rights); *State v. Beaver*, 181 Wis. 2d 959, 967, 512 N.W.2d 254 (Ct. App. 1994) (Beaver was given the *Miranda* warnings, indicated an understanding of the rights, repeated those rights "nearly verbatim," and nothing in the record indicated that Beaver was disoriented or did not understand the officer's questioning); *Lee*, 175 Wis. 2d at 360 ("The police read Lee his *Miranda* rights. Lee indicated that he understood them and was willing to make a statement."); *Shawn B.N. v. State*, 173 Wis. 2d 343, 364 497 N.W.2d 141 (Ct. App. 1992) (juvenile was given the *Miranda* warnings and stated that he understood them, then was read the "waiver provisions" and signed the card without any verbal reply). Unlike the defendants in those cases, Hudson verbally expressed at multiple points during the interrogation that he did not understand the consequence of waiving his *Miranda* rights, including while he was holding the pen and considering whether to sign the form. Even though Hudson eventually signed both sections of the form, his repeated verbal expressions of confusion distinguish this case from other cases where the State met its burden of showing a

knowing and intelligent waiver.  *See* DAVID M. NISSMAN & ED HAGEN, LAW OF CONFESSIONS § 7.5 (2023) ("[T]he government will have a difficult job of proving that waivers are intelligent if it can't show that the suspects admitted that they understood their rights.").

¶31     Instead, we conclude that the circumstances of this case are more analogous to the circumstances in *T.C. v. State*, 2010 Ark. 240, 364 S.W.3d 53 (2010), a decision by the Arkansas Supreme Court which provides instructive analysis.  In that case, a juvenile defendant signed two *Miranda* waiver forms during his interactions with the police.  *Id.* at 62.  The first time he signed a waiver form, he had been presented with the form with no explanation and had been directed to read it himself.  *Id.*  The second time he was asked to sign the waiver form, he said that he did not understand what the word "waiver" meant.  *Id.* Instead of explaining what "waiver" meant, the police gave the defendant the definition of voluntariness, stating:

> what you are saying, you are doing of your own free will … [w]e haven't made any promises.  We haven't threatened you in any way.  You are doing this because you want to do this.  And again, it is by your own free will that you do this, that you make this statement.

*Id.*  The Arkansas Supreme Court observed that the officer's explanation of the meaning of "waiver" "did not make clear that [the defendant] was giving up his rights to remain silent and to the assistance of counsel."  *Id.*  For this reason, the court concluded that "[i]t necessarily follows … that [the defendant's] waiver was not made with 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Id.* (citation omitted).

¶32     We recognize that the *T.C.* case is not perfectly on point because it involves a twelve-year-old child, not an adult.  Further, the officer's explanation of

20

a *Miranda* waiver in that case was incorrect, whereas Pataska's explanation was minimizing and incomplete. But, like the defendant in *T.C.*, Hudson expressed confusion about the consequences of his waiver, and his apparent misunderstanding was not addressed by Pataska's incomplete explanations. Consequently, the *T.C.* case is instructive in demonstrating that, although a defendant signs a *Miranda* waiver, their expressed confusion, coupled with law enforcement's incorrect or incomplete responses, may weigh against a determination that the waiver was knowingly and intelligently made.

¶33 The State argues that Hudson understood the consequences of waiving his *Miranda* rights because he had experience waiving his *Miranda* rights in a prior encounter with the police, he was an adult, and there was no indication that he was of below average intelligence. We are not persuaded. Although these personal characteristics, coupled with Hudson's signing of the form, weigh in favor of a valid waiver, *see Lee*, 175 Wis. 2d at 364-65, we do not think these factors overcome Hudson's expressed confusion about the consequences of a *Miranda* waiver, especially when we consider that Pataska's responses to Hudson's questions omitted the critical information that Hudson's statements could be used against him to secure a conviction. We therefore conclude that the State has not met its prima facie burden by a preponderance of the evidence that Hudson's waiver was knowing and intelligent.

¶34 We emphasize that we are not concluding that Pataska had a duty to provide information beyond that which is required under *Miranda* or to provide legal advice as to whether Hudson should waive his rights. *See Schilling*, 86 Wis. 2d at 86-87 ("When the police have fully and fairly given a suspect the *Miranda* warnings their duty is discharged, and we hold that they are under no further and additional duty whether or not the suspect acts wisely or foolishly or

21

misapprehends either the facts or the law." (citation omitted)). We are also not concluding that the police are required to repeat the *Miranda* warnings throughout an interrogation. *See Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010) ("Police are not required to rewarn suspects from time to time."). Instead, we conclude, based on the specific facts of this case, that the State has not made a prima facie showing by a preponderance of evidence that Hudson's waiver was knowing and intelligent because of Hudson's obvious confusion and repeated questions about the consequence of his *Miranda* waiver, because he never verbally indicated that he understood that his statements could be used against him, and because Pataska's responses to Hudson's questions minimized the consequence of his waiver by omitting information that Hudson's statements could be used against him to secure a conviction.

¶35 For the foregoing reasons, we conclude that the State has not made a prima facie showing by a preponderance of the evidence that Hudson possessed the requisite knowledge essential to understand the consequences of his *Miranda* waiver.

## CONCLUSION

¶36 For the foregoing reasons, the order of the circuit court is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.